GREENE COUNTY v. GRANT C. LYDY, Appellant.

In Banc, December 31, 1914.

1. **CONSTITUTIONALITY OF STATUTE: Presumption.** A friendly and strong presumption in favor of the constitutionality of a statute is indulged by the courts. Its nullity must be of such pronounced and imperative character as to put its unconstitutionality beyond any reasonable doubt whatever before a court will be justified in declaring it invalid.

2. ———: **Waiver: Estoppel: Interest of Objector.** A party may on the facts waive his right to challenge the constitutionality of a statute, or he may be estopped, or this or that challenge may be parried for the reason that the question in hand does not concern his own individual rights on the case made.

3. ———: **No Reasonable Doubt.** If the purported statute is beyond all reasonable doubt fatally vicious in a constitutional sense, courts do not coyly toy with such a situation but will declare it no law at all, provided the question of its validity has not been waived, or the challenging party is not estopped, and provided always it appears that his individual rights, as contradistinguished from another's, are affected.

4. ———: **Once Decided.** The usual rule is to consider constitutional questions once decided as no longer open. But the right doctrine, to be discriminatingly applied, is that a court for the correction of errors in other courts should be willing to correct its own where its opinions are shown to be radically wrong, whether on a new appeal in the same case or in another case, unless property rights springing from the maxim of *stare decisis* are affected.

5. ———: **Estoppel: Suit on Bond.** A litigant may be estopped to assert the unconstitutionality of a law in a suit on a bond given under it from which he has received benefits.

6. ———: ———: **Fees of Probate Judge.** Where the probate judge in a suit against him in which he is charged with having retained fees in excess of the amount allowed him by a certain statute, went into office after said statute was enacted and the fees he has retained were fees it authorized him to collect, he is estopped to assert the unconstitutionality of the statute, for he has availed himself of the benefit of the statute alleged to be unconstitutional. [Distinguishing Wood v. Kansas City, 162 Mo. 303.]

7. ———: ———: **Taking Office Under Statute.** Where an officer takes office under an existing statute and collects fees thereunder authorized by it, he is estopped to deny its validity, when called upon to account for fees he is not by it permitted to retain.

8. ———: ———: **Repeal of Old Law: Reenactment: Two Parties.** In the matter of official fees there are two parties interested in the law establishing them and in the fact of their collection, namely, the payor and payee. If the fees are paid under an existing statute, which limits the amount the officer may retain to a maximum amount, he cannot be heard to say that such statute repealed the existing law and being unconstitutional the existing law was revived or was the law under which he took office and it fixed no such maximum limit.

Greene County v. Lydy.

9. ——————: ——————: ——————: **Inseparable Invalid Proviso.** In 1905 the General Assembly in terms repealed the existing statute relating to probate fees, and reenacted that part of it establishing an itemized list of fees and the single proviso, and then went on and added two other provisos, by the second of which (being the third of the entire act) it. fixed a limit to the amount of fees that could be retained by the probate judge for any one year. If this proviso could be held inseparable from the rest of the act, and unconstitutional, and being invalid the whole act would perish with it, and the existing statute which it attempted to repeal brought back into life, defendant would not be liable for the fees which he is charged with having illegally retained. *Held*, that the whole law was not built around this alleged invalid proviso, that it cannot be held to be inseparably connected with the rest of the act, and that, defendant having accepted office under it and collected the fees which it authorized, cannot be heard to question the constitutionality of the proviso regulating the disbursements of those fees.

10. ——————: **Sale of Justice: Excessive Fees: By Whom Raised.** It cannot be held that to levy tribute on orphans' estates, in the shape of probate fees, is not a sale of justice in so far as those fees trickle into the pockets of the probate judge, and is a sale of justice in so far as the excess above a maximum amount he is permitted to retain is paid over to the county treasury for the use of the school fund. Even if that were true, it is a point the probate judge cannot raise when he is sued for such excess, for it concerns those who pay the fees, and not those who retain them.

11. ——————: **Fees: Same as Salary of Circuit Judge: Increased After Election of Probate Judge.** The act of 1905 provided that the amount of fees a probate judge could retain as his compensation could not exceed the salary of the circuit judge, plus ten per cent of the excess, and defendant was elected in 1910 for a term of four years. The act of 1911 constituted judges of the circuit court in certain counties jury commissioners and gave them a certain salary for such ministerial services "under this act, as 'jury commissioner solely." *Held*, that, whether or not the act of 1911 increased the compensation of a probate judge elected after its enactment by the amount of such commissioner's salary, it does not increase that of one elected prior to its enactment and still in office.

12. ——————: ——————: **Doing Clerk's Work.** The compensation of a probate judge is fixed by statute, and cannot be increased by a construction of that statute. The fact that he does much of the clerical work himself, and might, if he chose, legally consume more of the fees in clerk hire, will not justify him in laying claim to any part of the fees not so consumed or in-

creasing his own compensation thereby.    He cannot be paid according to the rule of *quantum meruit* or *quantum valebant.*

13. CONSTITUTIONAL LAW: Probate Judge's Salary: Substantial Historical Reason. In determining the validity of the third proviso to the act of 1905 fixing the amount of fees a probate judge might retain as his compensation, the court will not blink the substantial historical reason for its enactment, namely, that it was meant to remedy the disproportionate and inordinate salaries of probate judges.

14. ———: ——: Regulation According to Population. The provision of section 12 of article 9 of the Constitution, declaring that "the General Assembly shall, by a law uniform in its operation, provide for and regulate the fees of all county officers, and for this purpose may classify the counties by population," does not mean that the fees shall be regulated according to population only; it did not establish a hard-and-fast and necessary rule for classifying counties according to population, but at most made such method of classification permissible. Besides, it relates only to fees which may be charged and collected, and says nothing as to the distribution or retention of the fees after they have been collected.

15. ———: ——: Special Statute: Judicial System: County Officers. Probate courts come within the reason of the doctrine, uniformly held in this State, that the judicial department is a composite unit, that it is a whole, and that therefore acts dealing with the courts are usually held to be general, though not applicable to every court of like nature in the State. That doctrine fortifies the ruling in the case of State ex rel. v. Imel, 242 Mo. 293, that judges of probate courts are not county officers in the constitutional sense.

16. ———: ——: Same as That of Circuit Judge: General Statute. The third proviso to the act of 1905, declaring the amount of fees probate judges in certain counties may retain as their compensation shall not exceed the salary of the circuit judge, etc., although the statutes are so framed as to bring about inequalities in the salaries of circuit judges, is a general law.

17. ———: ——: Criminal Provisions Special. In a civil suit to recover from the probate judge fees retained by him in excess of the amount allowed to him by statute, the statute will not be held to be a special law for that it denounces certain acts done in one county as a crime, when if done in another they are not. That question can be considered only in a case wherein a probate judge has been charged with violating the criminal feature.

Appeal from Greene Circuit Court.—*Hon. Alfred Page,* Judge.

AFFIRMED.

*J. T. White* for appellant; *C. C. Crow, Joseph Morton* and *Vinton Pike* of counsel.

*George B. Webster, amicus curiae.*

*Sam. M. Wear* and *Neville & Gorman* for respondent.

LAMM, C. J.—This is a suit by the county of Greene, on behalf of its school fund, instituted in June, 1912, to recover from Lydy, probate judge, the sum of $2972.26, fees collected by him under color of his office during the year 1911 in excess of his salary under section 10695, Revised Statutes 1909, and alleged to be wrongfully retained.

Defendant answered in eleven paragraphs. Plaintiff moved to strike out paragraphs 3, 5, 6, 7, 8, 9, 10 and 11, leaving paragraphs 1, 2 and 4 remaining. This motion was sustained.

Thereupon plaintiff's further motion for judgment on the pleadings was sustained in the sum of $2670.66 and judgment followed accordingly. Defendant on due steps came up by appeal to this court, jurisdiction being lodged here because Greene county was a party and because of constitutional questions lodged in the case. Recurring to said answer, it admitted in its first paragraph that Lydy was judge of the probate court for the year 1911, and expended $40 for publishing dockets. In its second paragraph it averred that $140.11 was received by him as his commission under Revised Statutes 1909, section 331 (anent the collection of collateral inheritance taxes, etc.) and that

263Mo6

deducting said $140.11, he had received during the year 1911 fees amounting to $6927.40. In the fourth paragraph he averred that the reasonable and necessary expenses for clerk hire (exclusive of his own clerical services) were $60 per month, totaling $720 for the year; that he had paid thereon $525, and that the difference between that payment and said $720 is due and payable for clerk hire. These paragraphs having been left standing in the answer, the motion for judgment on the pleadings conceded their efficacy as a defense, *pro tanto,* and the amount of the judgment actually rendered shows they were allowed. All questions relating to rulings on such motion, and on the motions for a new trial and in arrest, group themselves logically either directly or indirectly under the constitutional points presently considered, and will be ruled in terms or impliedly under such head.

At root all said constitutional points compress themselves into the asking proposition: Is section 10695, supra, a constitutional enactment? A wise judge once remarked to me that in construing a statute it was a mistake not to read it and keep it before your eyes. What sly phase of dry humor he had in mind in that homely announcement springs so spontaneously in an alert mind that it needs no help by way of exposition. Attending to that pronouncement, we say this: If it will do to liken the vast expanse of speculative doctrine in a half dozen scholarly briefs filed by appellant and by *amici curiae* to the waste of waters Noah had to contend with on his famous voyage, then it would seem the Dove of Justice hovering over that expanse might better find a branch to rest the sole of her foot upon by avoiding that mistake and by reproducing, *ipsissimis verbis,* the part of the statute said to hold such an aggregation of vices as cause it to perish.

In 1905 (Laws 1905, p. 155) the General Assembly in terms repealed the existing statutes relating to

probate fees, to-wit, section 3240, Revised Statutes 1899 (*vide* Sec. 1 of Act of 1905, supra) and enacted a new statute out and out. Thereby it established the same itemized list of fees, and reenacted the single proviso, of the repealed section, and then went on and enacted the following new and additional provisions alleged to be invalid (now carried forward as live law in our present section 10695):

"Provided, further, that any probate judge, or probate clerk, charging and collecting any of the above fees when he has not in advance, or who shall not within thirty days after the charge and collection of such fee or fees have performed the service or made the record for which such fee was charged, be guilty of a misdemeanor.

"Provided, further, that whenever, after deducting all reasonable and necessary expenses for clerk hire, the amount of fees collected in any one calendar year by or for any one probate judge in any county in this State, during his term of office, and irrespective of the date of accrual of such fees, shall exceed a sum equal to the annual compensation provided by law for a judge of the circuit court having jurisdiction in such county, then it shall be the duty of such probate judge to pay such excess less ten per cent thereof, within thirty days after the expiration of such year, into the treasury of the county in which such probate judge holds office, for the benefit of the school fund of such county; and whenever at any time after the expiration of the term of office of any probate judge the amount of fees collected by or for him, irrespective of the date of accrual, shall exceed the sum equal to the annual compensation provided for a judge of the circuit court having jurisdiction in such county, it shall be the duty of such probate judge to pay such excess, and all fees thereafter collected by or for him on account of fees accrued to him as such probate judge, less ten per cent thereof, within thirty days from the

time of collection, into the county treasury for the
benefit of the school fund. And every probate judge
shall, within thirty days after the expiration of each
and every year of his term of office, file for record
with the clerk of the circuit court having jurisdiction
in said county, a statement, verified by his affidavit,
containing a full account of all fees collected and
amounts expended for clerk hire, by or for such pro-
bate judge, during such year, specifying the respective
amounts collected, from whom and dates when col-
lected, and the respective amounts paid for clerk hire,
to whom, and dates when paid; and within three months
after the expiration of his term of office he shall file
for record with said clerk of the circuit court a state-
ment, verified by his affidavit, of all fees which accrued
but were not collected during his term of office, specify-
ing the names of the parties from whom due, the
amounts due, on account of what services rendered
and the date of accrual. Every probate judge shall
before collecting, or being authorized to collect, any
fees whatsoever, give a good and sufficient bond in a
penal sum which, in counties of less than one hundred
and fifty thousand inhabitants, shall be equal to the
compensation of a circuit judge in such county, and
which in counties of over one hundred and fifty thou-
sand inhabitants shall be in a penal sum of double such
compensation of a circuit judge in such county; every
which bond shall have good and sufficient sureties to
be approved by the said clerk of the circuit court hav-
ing jurisdiction in such county, and shall be filed with
such clerk, and which bond shall be renewed within
twenty days after notification by the said clerk upon
his being satisfied that said bond, or the sureties or
any of them, is or are, or have become, insufficient, and
failure to renew such bond shall, until the same be
furnished, suspend the authority of the judge so in
default to collect any fees; every said bond shall run
to the State, and may be sued upon by any corporation

or person in interest, and shall be conditional upon the faithful performance by said probate judge of each and every the duties hereinabove imposed, and the prompt filing of the respective statements herein required, and the payments in full promptly when due into the county treasury, of each and every of the amounts to the extent and in the manner herein required.

"For all the purposes of this act the city of St. Louis shall be considered as a county.

"This act shall not apply to any judge now in office.

"All acts and parts of acts inconsistent herewith are hereby repealed.

"Approved April 1, 1905."

Two late cases decided by this court in Banc are drawn within the lines of discussion, viz.: State ex rel. v. Imel, 242 Mo. 293, and State ex rel. v. Lydy, 242 Mo. 316. We shall have somewhat to say of those cases during the course of this opinion. For the present, by way of foreword, we say this:

The former Lydy case was a suit counting on a breach of his official bond as probate judge of Greene during a term beginning January 1, 1907, and running four years. It seems he gave a bond as prescribed by said section 10695, conditioned, *inter alia,* that he pay over the excess of fees. He kept and performed his bond during the first three years of that term in that particular, but in the last year, 1910, was recalcitrant and was sued. On a demurrer to the petition in that case the lower court held the statute unconstitutional and the bond inoperative. On appeal here we reversed that judgment and remanded the case, one of several questions in judgment being estoppel. In 1910 Mr. Lydy was reelected probate judge for a new term and the instant case relates to nonpayment of such excess during the new term. What became of the former case when it went down is dark. It seems,

Greene County v. Lydy.

also (this not from the record but from briefs of appellant), that in his new term he refused to give the statutory bond. At any rate, the suit at bar is not on the bond, but is predicated of liability under the section cited:

In the Imel case, supra, the suit was also for a breach of his bond as probate judge. It seems he was elected probate judge of Buchanan, also, on January 1, 1907, and gave the bond required by section 10695. During the years 1907 and 1908 he failed to pay over the excess of fees. Such failure was alleged as a breach of his bond in a suit instituted against him on two counts. By answer to both counts he pleaded the unconstitutionality of section 10695 as his defense (the facts being conceded) and brought the fund into court. Plaintiff filed a motion to strike out the answer and another for judgment on the pleadings, standing on them. Both were overruled and plaintiff appealed from a judgment in favor of Imel on the merits. On full argument and consideration, we reversed that judgment and remanded the case with directions to enter one for plaintiff.

In both of those adjudicated cases, motions for rehearing came in from the same aggregation of veteran counsel who, having then locked arms, now stand shoulder to shoulder and appear for Mr. Lydy. As in the principal cases, so on those motions for rehearing, they were supported by elaborate briefs, raising in the main the same points made in the instant case, and were overruled. So that the doctrines of the Imel and Lydy cases have heretofore met our approval several times in Banc. Speaking broadly, the present appeal is a challenge of uncommon vigor to the soundness of those doctrines. We are asked on this reagitation to explode them, but I am instructed by a majority of my Brethren to say we stand by them. This because:

I.  *By way of preface.*

If this case is to be justly ruled, it is not amiss to remind ourselves of the following quickening and controlling, but trite, propositions:

(1)  When a court is called upon to adjudge the unconstitutionality of a statute solemnly enacted by the lawmaker with those formal requisites to give it force of law, the golden rules are to approach so grave a question with great caution, examine it from every possible aspect, and ponder upon it as long as deliberation and patient attention can throw light on the subject.  In the first instance, every such act rests in the bosom of a friendly, nay, a strong, a violent presumption, to-wit, one of its constitutionality.  Courts do not go out of their way to declare a statute unconstitutional.  It is not to be declared unconstitutional because of its unwisdom or because doubts arise. *Contra,* the nullity and invalidity of the act must be of such pronounced and imperative character as to put its unconstitutionality beyond any reasonable doubt whatever.  So, the question is one of high delicacy and imposes a discriminating use of judicial power.  To sustain the constitutionality of a statute, courts are astute to bring to its aid every allowable art and part of judicial power in giving full play to all wise rules of construction.  So, a party may on the facts waive his right to challenge the constitutionality of a law, or may be estopped, or this or that challenge may be parried for the reason that the question in hand does not concern his own individual rights on the case made.  As substantially holding those general doctrines we cite a few cases out of many announcing them—some in one, some in another.  [State ex rel. v. McIntosh, 205 Mo. l. c. 602 et seq., and cases cited; Ordelheide v. Modern Brotherhood, 226 Mo. l. c. 206 et seq.; State ex rel. v. Messerly, 198 Mo. 351; Daniels v. Tearney, 102 U. S. l. c. 421.]

But when all is said that can be said, if there remain no two ways about it but that the law is fatally vicious in a constitutional sense, courts do not coyly toy with such a situation but will declare it no law at all, provided the question has not been waived or the complaining party is not estopped, and provided always it appears that complainant's individual rights, as contradistinguished from another's, are affected.

(2)   In the next place, it is a usual rule of decision in this jurisdiction (subject to exceptions) to consider constitutional questions once decided as no longer open.   The contrary doctrine would put everything at sea, unsettle the law, and bring such questions within the maxim:  Obedience is miserable where the law is uncertain.   There is an amusing theory abroad in the land to the effect that a question once ruled here should not be taken as settled until it is ruled again.   This has been bitterly called (but in a dissent, State v. Thayer, 158 Mo. l. c. 47) the *regurgitation theory*, going to ruminants and the works of nature for the figure rather than to the *genus homo sapiens*.   I recall a case of that character, State ex rel. v. Gordon, 231 Mo. l. c. 568 et seq. (*q. v.*).   In that case out of deference to the highest law officer of the State, moving within what he deemed his constitutional and statutory orbit of duty, we reexamined a late decision on the same questions, prefacing the act with these observations:   "On the one hand we ought not to be forever settling and unsettling, planting and pulling up, buttoning and unbuttoning, knitting and unraveling; on the other, an opinion that cannot stand reexamination should not stand at all.   So, a court unwilling to reexamine is unworthy to sit in judgment."   The right doctrine, to be discriminatingly applied, is that a court for the correction of errors in other courts should be willing to correct its own where its opinions are shown to be radically wrong, whether on a new appeal in the same case or in another case, and where

property rules springing from the maxim of *stare decisis* are not affected. The curious, with possible profit, may consult a late case (Mangold v. Bacon, 237 Mo. l. c. 512 et seq.) for a review of the case learning on the related doctrine of the law of the case on second appeal. With this foreword we confront questions closer home.

II. *Of constitutional points and herein of the judgments in the Lydy and Imel cases.*

(a) The former Lydy case was ruled on the strength of the Imel case on the theory that like facts make like law, and that it is allowable to reason from similars to similars. As pointed out heretofore, those suits were on the bonds of the respective judges, and, for one of the grounds of decision, the doctrines of estoppel was applied. For this turn and only by way of argument, let it be conceded the statute is unconstitutional. Now, that a litigant may be estopped to assert the unconstitutionality of a law in a suit on a bond given under it from which he has received benefits, is good and acceptable doctrine. Let a case or so suffice. In Daniels v. Tearney, 102 U. S. 415, that precise condition arose. There the bond was conceded to be void because of infirmities in the statute carried over into the bond itself. Mr. Justice SWAYNE, speaking to the point, said on behalf of an unanimous court in part as follows:

"Conceding the bond to have been wholly void in both aspects, it does not by any means follow that it could not thereafter, under any circumstances, be enforced as between the parties, or that there is such error in the judgment that it must necessarily be reversed.

"A corporation is liable for negligent and malicious torts, including libel, assault and battery, malicious prosecution, and false imprisonment. In such cases the plea of *ultra vires* is unavailing. The corporation

is estopped from setting up such a defense. [National Bank v. Graham, 100 U. S. 699.] . . .

"The principle of estoppel thus applied has its foundation in a wise and salutary policy. It is a means of repose. It promotes fair dealing. It cannot be made an instrument of wrong or oppression, and it often gives triumph to right and justice, where nothing else known to our jurisprudence can, by its operation, secure those ends. Like the Statute of Limitations, it is a conservator, and without it society could not well go on. . . .

"It is well settled as a general proposition, subject to certain exceptions not necessary to be here noted, that where a party has availed himself for his benefit of an unconstitutional law, he cannot, in a subsequent litigation with others not in that position, aver its unconstitutionality as a defense, although such unconstitutionality may have been pronounced by a competent judicial tribunal in another suit. In such cases the principle of estoppel applies with full force and conclusive effect. [Ferguson v. Landram, 5 Bush (Ky.), 230. See Ferguson v. Landram, 1 Bush (Ky.), 548; Van Hook v. Whitlock, 26 Wend. (N. Y.) 43; Lee v. Tillotson, 24 Wend. (N. Y.) 337; The People v. Murray, 5 Hill (N. Y.), 468; City of Burlington v. Gilbert, 31 Iowa, 356; B. C. R. & M. R. R. Co. v. Stewart, 39 Iowa, 267.]

"In the case first cited, an injunction was applied for to prevent the collection of a tax authorized by an act of the Legislature passed during the late Civil War, to enable the people of a county to raise volunteers and thus avoid a draft for soldiers, and that object had been accomplished. In disposing of the case the court well asked, 'Upon what principle of exalted equity shall a man be permitted to receive a valuable consideration through a statute, procured by his own consent or subsequently sanctioned by him, or from which he derived an interest and considera-

tion, and then keep the consideration, and repudiate the statute?

"In United States v. Hodson, 10 Wall. 395, this court said: 'When a bond is voluntarily entered into and the principal enjoys the benefits it was intended to secure, and a breach occurs, it is then too late to raise the question of its validity. The parties are *estopped* from availing themselves of such a defense.'"

In State ex rel. v. Messerly, 198 Mo. 351, by receiving benefits under the law it was ruled that Kinsey had waived the right to challenge the law itself.

There is general language in Wood v. Kansas City, 162 Mo. 303 (a case cited and relied on by appellant), that must be read and construed in connection with the facts of that case; this, in accordance with the rule in that behalf. [State ex rel. v. St. Louis, 241 Mo. l. c. 238 et seq.] In the Wood case the subject-matter of the suit was notary fees. These fees were collected and accrued to him under a valid and pertinent State statute. In this fix, the city tried to hold them under a void city by-law passed in contravention of the statute. In effect, the case holds that the city could not unjustly enrich itself by doing that thing. An analysis of that case shows that the facts are not similar in quality to those dealt with in the Imel and Lydy cases, hence the contention of appellant that the doctrine of the former Lydy and Imel cases is impugned by that of the Wood case is without substance.

Moreover, the bonds in question were given by Imel and Lydy under section 10695, supra, for the very purpose of (quoting) "collecting, or being authorized to collect, any fees whatsoever." Those appellants used those bonds for that identical purpose. By virtue of the bonds, then, they got the fees in pocket, and for us to hold, as we did in those cases, that they could not repudiate the bonds and keep the

excess of fees, seems not only good law but good ethics as well.    To *get* because a bond is valid and *hold* because it is invalid is a new application of the schoolboy formula ''Heads I win, tails you lose.''

(b)    It will be observed that the act of 1905, brought forward as section 10695, Revised Statutes 1909, expressly repealed the former statute relating to probate fees.  So that, ostensibly, at the time appellant ran for office, was qualified by taking his official oath, and began his second term, the only law dealing with probate fees was said section 10695.  It was ruled in the former Imel and Lydy cases that where the fees were collected under the law by one who assumed to act under it in making the collection, such persons could not be allowed to treat the part of the law valid under which the money was collected and dispute the validity of another part of the same section prescribing how such fees, when collected, should be disbursed.  [State ex rel. v. Imel, 242 Mo. l. c. 304.]    And further on (p. 305) it was said:

''The law under which defendant collected the money in controversy was in force when he accepted the office of probate judge of Buchanan county.  By voluntarily accepting that office and collecting the fees which the law prescribed for his services, he waived the right to assail the constitutionality of that law.''

That pronouncement was buttressed by a California case (People v. Bunker, 70 Cal. 214) directly in point, and was said to find countenance in State ex rel. v. Speed, 183 Mo. l. c. 200, and Board of Education v. Kenan, 112 N. C. 566.  In the California case it was ruled:

''The defendant having assumed to act under a statute of this State, and having collected moneys according to the letter of that statute, cannot be heard to say that the statute was in conflict with the Constitution of the United States  .  .  .  and that he

was not bound to pay them over to the proper officer.''

The same proposition was involved in State ex rel. v. Speed, 183 Mo. l. c. 200, a case where an officer collected fees under a statute and then, when sued for an accounting for the fees by the State, faced about and asserted its unconstitutionality. On such singular contention we made the following ruling:

''This objection presents the anomaly of an officer assuming and holding an office under a law of the State, and of exacting and receiving for his services all the fees due and provided under said law, and when called upon by the State to account for the fees so obtained by him thereunder, saying to the State, Your pretended law is unconstitutional, and I am not obligated to account for the surplus fees collected by me, over and above the amount allowed for my compensation, which the law has provided shall be paid into the State Treasury. Such a plea should be as intolerable in a code of law as it is reprehensible in a code of morals.''

To parry the forceful thrust of propositions thus announced, appellant's learned counsel, as we get the run of an uncomonly ingenious argument, take the position that the *whole* of the act of 1905 falls to the ground. Why so? Because (so they argue) a part we have hereinbefore reproduced, the third proviso, is unconstitutional; hence another clause, to-wit, the clause repealing section 3240, Revised Statutes 1899 (the former section establishing probate fees) perishes, and this in turn leaves said section 3240 effective and operative as a subsisting statute on probate fees. Having reached that conclusion, they take another step in the evolution of their argument, to-wit: they say Lydy did not act under section 10695, Revised Statutes 1909, in collecting fees; *contra*, that he went to section 3240, Revised Statutes 1899, so *redivivus*, for such statutory authority; hence, no bene-

fits accrued to him under section 10695, nor was it his warrant of authority in the premises, *ergo,* the doctrine of estoppel held applicable in the former Lydy and Imel cases can not apply. But we are of opinion such argument is unsound and we decline to follow its lead, for that:

(1)  In the first place, in the matter of official fees there are two parties interested in the law establishing them and in the fact of their collection, to-wit, payor and payee. The law, ignoring neither, lifts the light of a comfortable countenance on both. Suppose such payor pays under a subsisting statute and such payee, concealing the fact but by way of mental reservation, received the fees (not under the statute he knows the payor is obeying, but) under some repealed statute the other knows nothing about—what then? We let the question answer itself.

(2)  In the second place, as closer home and vital, the argument of learned counsel proceeds on a false assumption, to-wit, that each and every provision of the act of 1905 leans on its fellow, that all are strictly interdependent, the one furnishing the legislative consideration for the other whereby if one falls as unconstitutional, all perish at the selfsame stroke. Observe, counsel are driven to this extremity to get rid of section one of the act of 1905 repealing former section 3240, thereby relieving their case from the doctrine of estoppel by bringing to life the old law on fees. We see no necessary and logical interdependence between the provisions of the act of 1905. The lawmaker first made a clean slate by his repeal, and then wrote his new law in the place once occupied by the old. Appellant does not contend that either the reenactment of the old list of fees or the reenactment of the old proviso is outside of legislative power or is not a perfect act. Now, the new act, outside of the repealing section, consisted in the main of a section establishing fees. Then followed three provisos. The

first is the old one and needs no attention. Not so with the second. It is entirely new and encompasses a vital matter, to-wit: It makes the collection of fees when the services have not been performed at the time or are not performed within the next thirty days, a misdemeanor. This second proviso struck at a crying evil. It is not pretended that its enactment on its face is not within legislative power and duty. The third proviso, as said, one relating to the disbursement of fees, is the one challenged. As to that we say: We will not swell this opinion by an extended discussion of those rules of statutory construction whereby a dead limb in the form of an unconstitutional proviso or provision may be pruned off of the main stem of the statute, leaving a sound law remaining in the rest of it. It is our clear duty to reach that end when by so doing we keep within the legislative intent. [State ex rel. v. St. Louis, 241 Mo. 246 et seq.; State ex rel. v. Gordon, 236 Mo. 170 et seq.] In this case, we cannot say the whole law was built up around the alleged unconstitutional proviso. We are unwilling to say that all the provisions of the act are inseparable; or that the act attempts to accomplish, instead of two objects (one valid, the other invalid) only one object and that one invalid; nor are we willing to say that the General Assembly, except for the third proviso, would not have enacted the law of 1905. The rule is that the presumption of constitutional validity attends each separable provision of the enactment, and that its invalidity must be made to appear beyond a reasonable doubt; this, in order that courts may fill the place of a nursing father and allow none of the law unnecessarily to perish by construction. If it were made to appear that the provisions of the act were inseparable or if each standing as a complete enactment was subject to an incurable vice of unconstitutionality, then the clause repealing section 3240 of the former statute would clearly fall with the rest. But as the case

we are dealing with calls for no such conclusion, we hold, first, that said repealing section is operative; second, that this leaves the first part of the law stand as a constitutional enactment relating to establishing fees; third, that, as the only subsisting law on the subject, appellant must be held to have collected the fees under section 10695; fourth, that under such circumstances he is precluded from asserting the unconstitutionality, if any, of the third proviso which, as said, merely relates to the disbursements of those same fees. We said this in effect in the former Imel and Lydy cases and say it again.

In leaving the question, another observation is not amiss, thus: There is a case the deep-going reasoning of which goes farther than we have gone—State ex rel. Evans v. Gordon, 245 Mo. 12. In that case Evans, holding a commission and at the very least at that time a *de facto* officer performing the duties of an officer without any pay, whose right to hold it was in contest, sued for his salary as State Superintendent of Public Schools. The State Auditor had refused to draw his salary warrants because of an old statute requiring an indemnifying bond. Evans, unable to give the bond, sued on the theory the law requiring one was unconstitutional. We quote from the opinion in that case (all the sitting members In Banc agreeing) thus:

"Under the Act of 1873 (Sec. 11830, R. S. 1909), the compensation payable to the office which relator is holding in possession was made subject to the condition that it should not be paid pending a contest for the office. Relator accepted the office with knowledge of this condition. As the Legislature may fix such compensation to a public office as it sees fit, or none at all, we can see no constitutional objection to its attaching such conditions as it deems proper to the payment of the compensation, such conditions to be binding upon any one who thereafter enters upon such

office and performs its duties. As stated above, the compensation has no relation to the amount or value of the services. There can be no application of the doctrine of *quantum meruit*. The officer takes the office *cum onere*. Having accepted it with the conditions imposed by the Legislature, upon whose will he must depend for any compensation at all, he cannot afterwards challenge the power of the Legislature to impose such conditions. . . .

"It is urged, further, that inasmuch as the relator is compelled by law to perform certain duties, he is entitled to pay therefor. We have shown that mere incumbency does not entitle an officer to pay. True, if he accepts the office, he must be faithful in the performance of its duties. But the law does not compel him to take the office. He accepts it of his free will, and with full knowledge of the conditions imposed by existing law."

In a broad sense, the *rationale* of the Evans-Gordon case fits the case at bar.

(c) It is argued for appellant that to hold the law valid, whereby the excess of fees is drained away from his own pocket into the public chest for a sacred and high constitutional purpose, to-wit, for the education of the school children of Greene county and the maintenance of free public schools therein (Art. 11, Constitution) would be tantamount to a "sale of justice." [Sec. 10, Art. 2, Constitution.] The briefs of *amici curiae* in that behalf attest such notable research and learning, and carry such an admirable tone, that we have been instructed by them. But we are not convinced. The point presents an attractive field of judicial exploration in order to get the right sources of judgment or right perspective in the exposition of our constitutional provision prohibiting a sale of justice. But we shall not enter the field. Do we understand counsel to assume the heavy, nay, insuperable

burden of maintaining the proposition that to levy tribute on orphans' estates as well as on estates of those dead and those *non compos,* in the shape of fees, is *not* a sale of justice insofar as those fees trickle from many rivulets into a great reservoir for the *exclusive and individual benefit of appellant,* and (wonderful to tell) becomes a sale of justice at the precise moment of time that the lawmaker commands that an excess in such fees be paid over to the county treasury for the maintenance of free public schools in Greene? If so, then counsel lightly assume an unthinkable and impossible burden. Their conclusion is a *non sequitur,* pure and simple, for they inadvertently labor under a fatal misapprehension, to-wit, that the point concerns appellant, when, *contra,* it concerns those who *pay* the fees and not those who *retain* them. In other words, the question touches his neighbor's rights and not his rights individually—hence he may not invoke it under cloak of assailing the unconstitutionality of the . statute. Agreeably to that view run many cases. [Wellington et al., Petitioners, 16 Pick. l. c. 95 et seq.; State v. Seebold, 192 Mo. l. c. 730, and cases cited; State ex rel. v. Currens, 111 Wis. 431; State ex rel. v. McIntosh, 205 Mo. l. c. 605; Ordelheide v. Modern Brotherhood, 226 Mo. l. c. 206 et seq. and cases cited.] As put by BROWN, J., in the Imel case, supra (242 Mo. l. c. 306): "It will be time enough to consider that issue when some person makes complaint that he has been required to purchase justice."

The long-established public policy, evidenced by a bundle of statutes, of paying into the common treasury fees in excess of a named amount or of an amount arrived at by use of the maxim, *Id certum est quod certum reddi potest,* should not be called in question at this late day unless presented in the case imperatively seeking a decision as vital. Quite a few of these statutes relate to paying over fees accruing in and

about the administration of justice, *e. g.,* clerks' and sheriffs' fees.

The point in hand is disallowed to appellant.

(d) In 1911 the General Asrembly enacted a statute (Laws 1911, p. 304 et seq.) prescribing that the judges of the circuit court of counties of the class of Greene should "constitute a jury commission board." This board is charged with the purely ministerial duty of listing qualified jurors and drawing juries. Each member of it is given a salary for his services "*under this act, as jury commissioner solely.*" It is argued for appellant that the probate judge under the third proviso of section 10695 is entitled to have his compensation swollen by the amount given by the act of 1911 to the circuit judge for performing such ministerial duty. A paragraph of the answer directed to that view was stricken out on motion, as said. Attending to that contention we rule that the question is not in this case whether a probate judge elected *after* the act of 1911 would be entitled to such increased compensation, hence it is reserved. If we should take the view, on comparing the two laws, that the act of 1911 could be invoked by the probate judge (on which we say nothing one way or the other) yet we would be obliged to hold that a probate judge elected *before* the act of 1911, as here, could not have his salary increased after that fashion druing his term of office. [Art. 14, sec. 8, Constitution.]

(e) Counsel argue that appellant, had he so chosen, might have consumed more of his fees in clerk hire than he did, that he did much of the clerical work himself and is entitled to pay therefor in excess of the salary prescribed by section 10695. We will not pursue the subject far, for it is argued faintly we opine. To take counsel's view not only would be to enlarge the statute by construction to an extent not within its letter or spirit, but it would be to pay appellant on the doctrine of a *quantum meruit* or a *quan-*

*tum valebant.* This we may not do. [State ex rel. Evans v. Gordon, 245 Mo. l. c. 28-9.] The particular mode and manner of paying official salaries pointed out by the statute is the touchstone of construction and the officer is confined to that manner and mode. So, the statute is to be strictly construed against the officer. [*Ibid.,* l. c. 28.]

The premises all considered, we could appropriately bring this opinion to an end at this point by affirming the judgment; for whilst we have not mentioned all, yet we have disposed of every assignment of error, we deem material, adversely to appellant; but learned counsel have pressed upon us another main question, to-wit, that the third proviso of section 10695 is unconstitutional. If views expressed hitherto in this opinion are sound, then, appellant cannot raise the question. But we may as well pass upon it lest, by avoiding it, it may be taken that we have come to consider the act of 1905 bad in a constitutional sense and possibly thereby provoke a new crop of litigation.

(f) In the Imel case, supra, we held the third proviso constitutional. The question we are now to consider is: Was that holding sound? We think so, because:

(1) In the first place, a proper judicial attitude towards the questioned proviso should be (to fall into the significant phrase of Lord Hobart) that of a nursing father. It undertook to provide a remedy for grave mischiefs, to-wit, disproportionate and inordinate probate salaries. We may take judicial cognizance of facts of current history and, therefore, may not blink the substantial historical reasons much bruited underlying the enactment.

(2) In the second place, something is said *arguendo* by way of pointing out absurd results in inequalities in salaries arising under the proviso. But we put that view away from us with entire complac

ency for more reasons than one, mentioning one or two, to-wit: (1) that under the old system (which appellant invokes as still existing) sharper and more absurd inequalities sprang than under the new which he inveighs against; and (2) if a probate judge be allowed out of the fees of his office to keep as much as the circuit judge sitting in the same county gets as a salary, at first blush and on the surface of things he has no just complaint on the score of inequality or inadequacy.

(3) In the next place, there is a provision of our Constitution (Sec. 12, art. 9) reading:

"The General Assembly shall, by a law uniform in its operation, provide for and regulate the fees of all county officers, and for this purpose may classify the counties by population."

It is appellant's present contention, as it was in his former case, that he is a "county officer" in a sense within the purview of the quoted provision, hence his salary could only be regulated by general law classifying counties by population. His argument is that on that assumption the proviso in hand is inflicted with an incurable constitutional vice, among other things, because it ignores a population basis. Henderson v. Koenig, 168 Mo. 356, in effect, held with appellant on the contention that a probate judge was a "county officer." We will presently recur to the matter, but take leave here to point out that Kenefick v. St. Louis, 127 Mo. 1, holding in judgment not only section 12, article 9, of the Constitution, but section 13 of the same article, arrived at a different conclusion on the "population theory." Said section 13 reads:

"The fees of no executive or ministerial officer of any county or municipality, exclusive of the salaries actually paid to his necessary deputies, shall exceed the sum of $10,000 for any one year. Every such officer shall make return, quarterly, to the county

court of all fees by him received, and of the salaries by him actually paid to his deputies or assistants, stating the same in detail, and verifying the same by his affidavit; and for any statement or omission in such return, contrary to truth, such officer shall be liable to the penalties of wilful and corrupt perjury.''

In this Kenefick case the constitutionality of an act frankly regulating the compensation of the sheriff of the city of St. Louis was in judgment, and, after quoting section 12 of article 9 of the Constitution, this court said:

''But a glance at the act in question will satisfy one that it does not purport to establish any scale of fees receivable by the sheriff. It limits the total amount of compensation which he may retain from his fees, in accordance with the command of section 13 of article 9.

''The fees of the office of sheriff were regulated by general laws (R. S. 1879, secs. 5606 and following), at the time the fees in dispute were earned, just as such fees are now governed by statutes (Laws 1891, pp. 145 and following), which are general in nature, within the definition of the constitutional language last above quoted.

''The act shows on its face that it is designed to enforce the next following section (13) of the same article. If it is proper legislation for that purpose, it should be sustained.''

Observe, the Constitution in section 12 uses the verb *may classify*. If it had meant there was no other valid method of making a law as to fees uniform in its operation except on the population theory, would it not have used the sign of another mood, *shall?* Observe, moreover, that section 12 says nothing about the disbursement of fees or retaining fees, whereas section 13, article 9, is directed somewhat to that question as to those county officers who are executive and ministerial officers and puts a hard-and-fast maxi-

mum limit on their compensation. In the views taken of those two sections there seems to be an irreconcilable conflict between the Kenefick and Henderson cases, but as the Henderson case (on the "county officer" phase) was overruled in the Imel case, it is not worth while to analyze them. It is sufficient to rule that the "population theory," as a condition precedent in passing a validly uniform law regulating fees as argued for appellant, is a permissible but not a necessary one; and to rule further that the first part of section 10695 regulating fees is confessedly general, while the third proviso does not relate to the regulation of fees, but to the retention of them.

(4) In the next place, let us consider the point made against the proviso that it falls under the constitutional ban against special laws and herein recur to the question of "county officers" and the holding in the Imel case on that head.

The question of special legislation relating to courts and the judiciary of the State has been up for consideration in a marked line of cases. There is a settled doctrine of this court running through them like the distinguishing and marking thread of the British navy, that has been stated this way in State ex rel. v. Fort, 210 Mo. l. c. 533:

"The upshot of the whole matter is this: The judicial system of the State is a *whole,* and therefore acts dealing with the courts have been usually held general though not applicable to every court of like nature in the State. [State ex rel. v. Shields, 4 Mo. App. 259.]

"The reasoning of all the foregoing cases may be found crisply stated in the above generalization."

The cases referred to as authority for the proposition formulated in that excerpt were in part: State ex rel. v. Hughes, 104 Mo. 459; State v. Orrick, 106 Mo. 111; State ex rel. v. Field, 119 Mo. l. c. 611; State

ex rel. v. Yancy, 123 Mo. 391; State ex rel. v. Etch-
man, 189 Mo. 648; Coffey v. Carthage, 200 Mo. 616.

Agreeably to such doctrine it has been held that the
judicial department of the State is a "composite unit."
[Zellars v. Surety Co., 210 Mo. l. c. 106.] Mindful of
the philosophy of such rules of decision, many legis-
lative acts relating to courts—acts more plainly local
and special than the proviso challenged—have been
held immune from a charge of the constitutional vice
of being local and special laws. [Vide cases supra.]
That probate courts come within the reason of the
doctrine just announced seems plain and fortifies the
ruling in the Imel case to the effect that judges of
those courts are not "county officers" in a constitu-
tional sense. As said before, we stand by the definition
of "county officers" there given, and the ruling there
made and the reasoning leading up to it.

(5) In the next place (and yet closer home), the
proviso assailed, taken at its face value, is a general
law in the most exacting sense. It opens automatically
to let every probate judge in whenever named condi-
tions spring. It is only by a rare versatility of refine-
ment in speculative gloss that any imperfection is
claimed to be brought to light; for, as said, on its
face and purported scope it is general and nothing
else. At root appellant's grievance against the third
proviso is that a probate judge shares the fortune of
the circuit judge of the county. The judges of certain
circuits, the argument assumes, have their salaries
regulated by special acts and in a way to bring about
inequalities in salaries between themselves as well as
between them and other judges. By regulating the
compensation of probate judges in the counties of
these same circuits by reference to the salaries of cir-
cuit judges therein, it is claimed the third proviso be-
comes local and unconstitutional. It is not quite clear
whether appellant's contention in ultimate scope and
effect is intended to undermine and explode the par-

Greene County v. Lydy.

ticular acts regulating. the salaries of the circuit judges in question, or whether in scope and effect it intends to admit the validity of the circuit judge acts, but insists that their application by the proviso to probate judges makes it void.  Either way it is unprofitable to pursue the matter; for it is evident enough that correct argumentation leads to this, namely, that if the circuit judges' acts are valid, then, the reference to them in the proviso carries their validity over to the proviso itself, provided always probate judges may be put in the same class.  If, on the other hand, the circuit judge's acts are void as unconstitutional, then, by the same token a reference to them in the proviso carries over their invalidity to it, and makes it to perish.  Now, the acts relating to circuit courts and circuit judges have been in principle sustained in cases cited, supra, as well as directly in others not cited, and yet in others by necessary implication.  We will not reopen that question. *Stare decisis.* This leaves for consideration the question whether probate judges, in the matter in hand, may be constitutionally classified with circuit judges.  As to that we say: There may be many reasons why such is an unconstitutional classification, but not one of them occurs to us.

The point is disallowed to appellant.

(6)  It is urged that because the proviso denounces certain acts done in one county as crimes, when if done in another they are not, vitiates the proviso.  But we are not dealing with the criminal features of the law in this civil case.  It will be time enough to do that when some probate judge has violated the penal provisions, has been duly charged with and convicted therefor, and on appeal to this court or on a writ of *habeas corpus* without appeal, claims his liberty because the criminal features of the law are unconstitutional and no law at all.  We reserve the question.

It has been shrewdly said that in the administra-

tion of justice it is quite as important that justice *appears* to be done as that it *is* done. We may at least concede enough substance in that observation to justify (or maybe, the better word is excuse) the extended consideration given this case.

Appellant erred, doubtless through excess of zeal or natural pride of opinion, in not giving his bond and bowing his neck to the yoke of a law whose benefits he enjoyed. There is a couplet running this way:

"Who to himself is law, no law doth need,
Offends no law, and is a king indeed,"

but the notion outlined thereby is of no value in jurisprudence. In the eye of the law no one can successfully build a superstructure of rights on his own wrong. Hence failure to give the bond avails nothing.

There are other questions in briefs. Some we deem immaterial. Others are impliedly ruled in those resolved. They must be taken as considered although not mentioned.

On the conclusions and reasoning announced, it would seem there is nothing to do except to affirm the judgment, which accordingly we do. Let it be so ordered. *Brown, Walker* and *Faris, JJ.,* concur; *Bond, J.,* concurs in result; *Woodson* and *Graves, JJ.,* dissent.