(79 South. 280)

No. 22640.

HAYNE et al. v. ASSESSOR et al.

NATALIE OIL CO. v. SAME.

(June 30, 1917. On Motion for Rehearing or to Correct Decree, Oct. 29, 1917. On Rehearing, Nov. 2, 1917. On the Merits, May 27, 1918.)

*(Syllabus by the Court.)*

On Motion to Dismiss Appeal.

1. APPEAL AND ERROR ☞374(4) — APPEAL BONDS — EXEMPTIONS — CONSTRUCTION OF STATUTE—POLICE JURIES.

Under the Act No. 173 of 1902, providing that state, parish, and municipal boards or commissions exercising public power or administering public functions shall not be required to furnish bonds in judicial proceedings, police juries, even as boards of reviewers of assessments, are exempt from furnishing appeal bonds.

2. APPEAL AND ERROR ☞641 — ERROR IN CLERK'S CERTIFICATE TO TRANSCRIPT—DISMISSAL OF APPEAL.

Under Code Prac. art. 898, an appeal should not be dismissed on account of an error in the clerk's ceritficate of correctness and completeness of the transcript, if it does not appear that

the error is imputable to the appellant; in such cases, reasonable time should be allowed to correct the error.

3. APPEAL AND ERROR ☞656(1)—TRANSCRIPT OF APPEAL—DEFECTS—DISMISSAL.

Under the provisions of Act No. 229 of 1910, p. 388, when a transcript of appeal has been made as directed by the appellant or by both parties to the appeal, the appeal should not be dismissed on the ground that the transcript is defective; but either party, or the court, shall have the right to have any omitted part of the record filed as a supplemental transcript. There seems to be less reason for dismissing an appeal on account of a defect in a transcript, made without any instructions from the appellant, on the responsibility of the clerk of court.

On the Merits.

4. TAXATION ☞331—RETURN—AFFIDAVIT — STATUTE.

The law requires that a return of property for assessment shall be verified by the affidavit of a person competent to take an oath, who shall, at least, believe the statements therein contained to be true, and shall sign the same in the presence of the assessor, or his deputy; and a return bearing the signature of a law firm, with the name of an individual underneath it, not written by the owner, but, by the clerk of the court, and the word "agents," added thereto, does not meet those requirements.

5. TAXATION ☞462—FAILURE TO RETURN FOR ASSESSMENT—ESTOPPEL.

The property owner who fails to make the return of his property for assessment, in the manner and within the time required by law, is estopped to contest the correctness of the assessment as made by assessor, or by the assessor in concurrence with the board of review.

6. HIGHWAYS ☞125—ROAD TAX—POWER OF POLICE JURY—STATUTE.

A police jury, with the approval of a majority in number and values of the property taxpayers, obtained in the manner provided by law, may impose a parish tax of five mills, for five years, for road purposes, but has no power, even with the approval of such majority, to impose another such tax, for the same purpose upon the property in particular wards of the parish called a road district.

7. TAXATION ☞301(7)—IRREGULARITY — ESTOPPEL.

The fact that a property owner has, for several years, paid a tax unlawfully imposed, does not necessarily estop him to deny its legality and refuse to continue such payments.

*(Additional Syllabus by Editorial Staff.)*

8. TAXATION ☞499 — FEES OF ATTORNEY — DISTRICT ATTORNEY—CONSTITUTIONAL AND STATUTORY PROVISIONS.

Under Act No. 170 of 1898, § 56, providing that the attorney at law who represents the tax

collector in all proceedings for the reduction of assessments and collections of taxes shall receive 10 per cent. on the amount collected, to be paid by the party against whom the judgment is rendered in whole or in part, and to be collected by the tax collector, as costs, when the taxes and other penalties are collected, and in view of Const. art. 125, providing that the district attorney shall receive a fixed annual salary and shall "also receive fees," and article 180, providing that no officer whose salary is fixed by the Constitution shall receive any fees, except where otherwise provided by Constitution, and Act No. 125 of 1912, providing for the necessary expenses of police juries, the allowance of a fee under section 56, though the attorney was the district attorney, was proper.

Appeal from Eleventh Judicial District Court, Parish of Red River; W. T. Cunningham, Judge.

Suits by W. P. Hayne and others and by the Natalie Oil Company against the Police Jury of Red River Parish as a board of review, and against the Assessor and Tax Collector, to have the assessments of plaintiffs' property canceled, or, in the alternative, reduced. Cases consolidated before trial, and judgment rejecting the demands of plaintiffs W. P. Haynes and others in respect to a land tax, and decreeing the nullity of a road tax, and plaintiffs W. P. Haynes and others and the defendants appeal; the Natalie Oil Company being before the court as an appellee. Judgment affirmed.

Nettles & O'Quin, of Coushatta, for plaintiff Natalie Oil Co. J. F. Stephens, Dist. Atty., and S. R. Thomas, both of Coushatta, for defendants.

## On Motion to Dismiss Appeal.

O'NIELL, J. Two suits were brought against the police jury, as a board of reviewers, and against the assessor and the tax collector, to have the assessments of the plaintiffs' property declared illegal and ordered canceled, or, in the alternative, to have the assessments reduced. The cases, being identical as to the issues involved, were consolidated before the trial. The judgment, in each case, decreed the assessment valid, and condemned the plaintiff or plaintiffs to pay 10 per cent. thereof, as attorneys' fees, except as to a certain road tax, which was decreed unconstitutional. Orders of appeal, returnable to this court, were granted to all parties, when the motions for new trial were overruled. Thereafter the appeal of the Natalie Oil Company, plaintiff in one of the cases, was, on motion of counsel for the company, made returnable to the Court of Appeal. That case, therefore, is before us only on the appeal of the defendants from the judgment decreeing the road tax unconstitutional. And in that case the plaintiff, appellee, has filed a motion to dismiss the appeal, on the following grounds, viz.: (1) That the appellants have not furnished an appeal bond; (2) that the clerk's certificate of correctness and completeness of the transcript is not a sufficient or proper certificate; and (3) that the transcript is not complete.

## Opinion.

[1] In a very recent decision, in Police Jury of La Salle Parish v. Police Jury of Catahoula Parish, 144 La. ——, 80 South. ——, it was held that, under the Act No. 173 of 1902, providing that state, parish, and municipal boards or commissions exercising public power or administering public functions shall not be required to furnish bonds in judicial proceedings, police juries are exempt from the furnishing of appeal bonds. The appeal in this case is prosecuted by and on behalf of the police jury and the appellants were therefore not required to give appeal bonds.

[2] The clerk's certificate of correctness and completeness of the transcript is somewhat irregular. It recites that the transcript contains all of the pleadings, all of the oral evidence taken, and the proceedings of the police jury relative to road district No. 2, offered by defendants, being all the evidence ordered put into the transcript, also a true extract from the minutes, etc., and concludes with the expression, "as shown on the record

in this office." The certificate should recite, not that the transcript contains all of the original pleadings, etc., but that it contains true and correct copies, or that it is a true and correct transcript or copy, etc. The expression, "true and correct extract from the minutes" is a palpable error, intended for "true and correct abstract of the minutes." Article 898, C. P., however, provides that an appeal shall not be dismissed on account of any defect, error, or irregularity in the certificate of the clerk, unless it appears that such defect, error, or irregularity is imputable to the appellant, but that, in all such cases, the court shall grant a reasonable time to correct such errors or irregularities, unless they be waived by the appellee. There is no indication that the defects, errors, or irregularities in this certificate are imputable to the appellant. As the case cannot be heard until the next term of court, no harm or delay can result from our granting a reasonable time to the appellant to have the errors corrected.

[3] The third complaint, in particular, is that copies of two documents introduced in evidence by the plaintiff, being copies of the proceedings of the police jury promulgating the result of two special elections purporting to authorize the levy of two separate road taxes, were omitted from the transcript. Act No. 229 of 1910, p. 388, provides that, when a transcript is made as directed by the appellant, or by both parties to the appeal, the appeal shall not be dismissed on the ground that it is defective, but the parties or the court shall have the right to have the omitted part of the record filed as a supplemental transcript. It is contended by the learned counsel for the appellee that the appellants did not file with the clerk of the district court a written list of the portions of the record to constitute the transcript of appeal, as permitted by the statute, and that therefore they are not entitled to the benefit of the act. There is no such list in the record, but the clerk's certificate indicates that one was filed by the appellants. We refer to the concluding expression in the certificate, after the recital that the transcript contains all the evidence that the clerk was ordered to put into it, "as shown on the record in this office." In their brief, the learned counsel for the appellee say that it appears that it was by the appellants' orders that only certain portions of the documentary evidence were embodied in the transcript, and that the transcript was compiled under the direction of the appellants. At any rate, there would seem to be better reason for our refusing to dismiss an appeal on account of a defect in a transcript made by the clerk on his own responsibility and without instructions from the appellant than there would be if the transcript had been made as directed by the appellant, under Act No. 229 of 1910. Our conclusion is that either party to this appeal should have the right to file, within the time that shall be allowed for correcting the errors or irregularities in the clerk's certificate, any omitted portions of the record, as a supplemental transcript.

The motion to dismiss the appeal is overruled, the appellant is allowed 30 days in which to have the errors or irregularities in the clerk's certificate corrected, during which time, either party hereto shall have the right to file any omitted portion of the record as a supplemental transcript.

#### On Motion for a Rehearing or to Correct the Decree.

PER CURIAM. The appellant has failed to have the errors in the certificate of the clerk of the district court corrected, and has failed to supply the omitted portions of the record within the 30 days allowed in the order of this court overruling the appellee's motion to dismiss the appeal. The appeal is therefore dismissed.

#### On Rehearing.

PER CURIAM. In entering our last order in these consolidated cases the court over-

looked the supplemental record which had been filed July 30, 1917, and erroneously ordered the cause to be dismissed.

It is now ordered that the order dismissing the appeal in these cases be recalled and annulled, and the motion to reconsider our former decree herein be denied. Rehearing refused.

### On the Merits.

MONROE, C. J. Plaintiffs brought suits to annul, or, as the case may be, reduce, the assessments upon certain land owned by them in the parish of Red River, and to have declared unconstitutional and void a tax levied by the police jury for road building upon the property in wards 4, 5, and 6 of that parish. As the cases involved similar facts and identical questions of law, they were consolidated and tried together, but thereafter, as we are informed through the briefs of counsel, the Natalie Oil Company made a settlement with regard to the tax first above mentioned, and there was judgment rejecting the demands of the other plaintiffs in respect to that tax, but decreeing the nullity of the road tax, from which judgment W. P. Haynes et al. and the defendants have appealed, and the oil company is before the court as an appellee.

Confining our attention for the moment to the tax first mentioned, the case of Haynes et al., as disclosed by the evidence in the record, is as follows:

They own 582 acres of land in the parish of Red River, upon which, during the year 1915, many wells were drilled, and began producing oil during that year, probably in the summer, and during the year 1916 produced 161,000 barrels of that mineral, which on January 1st was worth $1.05 per barrel, so that the output for the year at that rate would have been worth $169,050.

Some of the wells were operated by plaintiffs and others, constituting a majority, by leasing companies in the output of which plaintiffs were interested to the extent of about 50 per cent. At some time prior to April 1, 1916, a law firm which had, for some years, represented W. P. Haynes, who, in turn, represented his co-owners and coplaintiffs, as agent in matters of assessment, made the following return of the land in question, for the assessment of that year, to wit:

| Land. | Number of Acres. | Average Value per Acre. | Total Value. |
|---|---|---|---|
| Timber, where lands are owned by another. | | | |
| Class C. ...........200 | 2 | | $ 400 |
| Cotton Class A....100 | 10 | | 1,000 |
| Cotton Class B....242 | 5 | | 1,210 |
| Cotton Class C.... 40 | 3 | | 120 |
| Total assessment ........................... | | | $2,730 |

(The legend "Timber, where lands," etc., we take to have been left upon the return as found upon the form that was used, as it is not here disputed that plaintiffs owned the 582 acres so returned.)

Following the above is a description of the lands there mentioned, by governmental subdivisions, and after that, the legends:

### Consolidated Agricultural Statistics.

| Number of Acres. | |
|---|---|
| Uncultivated .......................................... | 200 |
| Cultivated ............................................. | 332 |
| Total ................................................. | 582 |

To all of which there is attached the form of affidavit prescribed by section 15 of Act 170 of 1898, followed by what purport to be the signatures "Nettles & O'Quin, L. O'Quin, Agents" and the formula "sworn and subcribed," etc., signed by the clerk of the court.

The allegations of complaint with respect to the first-mentioned tax are that plaintiffs made a return of their land for assessment and that the same was accepted by the assessor; that the assessor gave notice that the listing and valuation of property had been completed, and that the rolls were open to inspection; that plaintiffs' agent visited his office and found his valuation unchanged; that, on June 5th, the police jury met as a board of review, and the valuation of plaintiffs' property remained unchanged at that time; that the board adjourned without action and indefi-

nitely; that on July 11th the board, contrary to the provisions of article 48 of the Constitution of 1913, and without any kind of notice to petitioners, attempted to reconvene for the consideration of assessments; that just prior to "its said meeting" petitioners' agents learned of the intention and attended the "would-be meeting," thereby discovering that the lists, for the first time, showed an assessment of "48,403 bbls. of oil, at 60 cents per bbl.," of a total valuation of $29,041; that petitioners had no notice of "the increase" in the valuation of their estate, and were deprived of a hearing before the assessor; that they protested, without avail, that they were taken by surprise; that the assessor was without authority to place any additional valuation upon petitioners' property after their return had been accepted and placed on the list, the lists advertised as completed, and the "board had held its meeting on June 5th, as required by law; that the board of review was without authority to act as such after the first Monday in June, or to increase petitioners' assessment without proper notice; that they are informed that the estimate of 48,403 barrels of oil was made by some one in the employ of the police jury, who was unauthorized so to do, and was placed on the list by the police jury; that they anticipate that the assessor will add said estimated amount to the assessed valuation of their lands; that said assessment is void for the further reason that the oil is not reduced to possession, and is not property within the meaning of the law; for the further reason that the supposed valuation which equals said sum was not in existence on January 1, 1916, or at any other time prior to the completion of the assessment rolls; and for the further reason that petitioners do not own the oil and gas beneath the land, but have leased the rights to explore therefor to various ·companies, and that the lessees become the owners of such of those minerals as may be found; that there is no

law authorizing the assessment of oil and gas not reduced to possession; that the attempt of the assessor and the board operates as an attempt to levy a tax on petitioners' income; that in the alternative the estimate of the oil greatly exceeds the amount produced on petitioners' land and greatly exceeds the value of the same; that "the valuation of property in Red River parish never exceeds 25 per cent. of the actual valuation, for any purposes whatever"; that the board of equalization has directed the assessor "to determine the daily production of the oil properties and place a valuation upon the daily production of $40 per barrel." By an amendatory petition, it alleged that petitioners have not leased all of their oil-producing land, but are operating some of it themselves.

There is a wide variance between the allegations of the petition and the facts as disclosed by the record; but, as we have concluded, for reasons to be stated, that plaintiffs have no standing to contest the correctness of the assessment as concurred in by the assessor and the board of review, we find it unnecessary to enter upon that subject, save to say that the main question presented for decision is, not whether there has been an assessment of oil, which had been omitted from the roll as originally completed, but whether the assessment of plaintiffs' land as entered upon the original roll should be increased. Dealing with that question, we find that there has been no assessment of oil. The ₐssessor no doubt realized that, to accept plaintiffs' return as the basis of his assessment, and appraise, as available for agricultural purposes, only, at $2,730 lands, the mineral output of which, inuring to the owner, he believed to be of large value, would be to perpetrate a fraud upon the state, and he, therefore, delayed the completion of his rolls until h'e could ascertain the exact extent, and at least proximate value, of that output, and upon that basis, add to the agricultural value of

the land, as returned by plaintiffs, its mineral value, as predicated upon its mineral output; and it was only to that end, and as showing the basis for the increased assessment of the land, that the oil was mentioned on the roll.

[4] Our reasons for the conclusion that plaintiffs have no standing to contest the correctness of the assessment list filed by the assessor are, briefly, that the return upon which they rely was not verified as required by law. Act 182 of 1906, § 3, pp. 332, 333, declares:

"That it shall be the duty of each taxpayer * * * to fill out a list of his property and make oath to its correctness, in the manner and form prescribed by existing laws, and return the same to the assessor on or before the first day of April of each year, in default of which, for any cause whatever, he shall be estopped from contesting the correctness of the assessment list filed by the assessor."

The form and manner of the return are prescribed by section 15 of Act 170 of 1898, p. 354, which provides a form of oath to be taken and subscribed by the taxpayer. Section 18, p. 356, of the same act declares:

"That each tax assessor, in person or by duly qualified deputy, is hereby authorized to administer the oath or affirmation, attached to the said list, in the manner required by law for administering oaths; and is required, in person, or by deputy, to actually administer the said oath or affirmation orally to the person signing same; and should any tax assessor or deputy sign such jurat without having actually administered said oath, he shall be guilty of nonfeasance and malfeasance in office, under article 217 of the Constitution, and the tax assessor shall be liable on his bond for all the taxes due by the person purporting to have taken said oath or affirmation, and shall forfeit all his commissions and shall be at once removed from office by the Governor. And, further, that any willful misstatement of the assessor, or any authorized deputy, made under oath, shall be considered and punished as perjury, as provided by the laws of this state in other cases."

The form of oath and jurat, as attached to the return made on behalf of plaintiffs, reads (in part):

"I, whose post office, is * * * do solemnly swear that the list on this paper which I have signed, is a correct and complete list of all the property of which I am owner, or have in my possession or control, in capacity set forth in said list, * * * that the number of acres of land has been stated, and that the valuation placed thereon by me is true and correct, to the best of my knowledge and judgment and I have given the proper description of said lands and all other taxable property as the law requires so help me God.

"[Signed] Nettles & O'Quin.
"L. O. O'Quin, Agents.

"Sworn to and subscribed before me this 28th day of March A. D. 1916.

"[Signed] J. W. Oglethorpe, Clerk D. C."

The heading upon the face of the return reads:

"Assessment List of W. L. Hayne Estate.
"Mr. White, W. L. Hayne Estate, Parish of ——.

'Post Office W. P. Hayne, Mgr.
"Boyce, La."

The law firm of Nettles & O'Quin appears here as representing the plaintiff, but neither the name of the firm nor the names of its members appear on the list, or return, to answer the call of the oath, reading, "of which I am owner or have in my possession or control, in capacity set forth in said list," so that it does not appear from the oath that Nettles & O'Quin, or L. O. O'Quin, or either of them is the owner of the land, or the agent of the owners, or that they have any connection with the land, or that there was any reason why the owner or some one representing the owner should not have made the return. Moreover, there can be no such thing as an affidavit by a law firm, and the owner of the name "L. O. O'Quin," which appears below that of the firm of "Nettles & O'Quin," testifies that it was put there, not by him, but, by the clerk of the court. Again, it will be observed that the oath is framed in the first person singular, and yet purports to be signed by a law firm and an individual, who upon the face of the affidavit is not shown to be a member of the firm, and that, following the names, appears the title "agents," which was evidently attached to the firm signature, before that of the indi-

vidual affidavit was added by the clerk. On the subject of the use of the firm name and the addition of his own, Mr. O'Quin, who is shown to be a lawyer and notary, and, with Mr. Nettles, to have represented the plaintiff, Hayne, in assessment matters, for, as we infer, several years, testifies as follows:

"Q. (By counsel for plaintiffs). Mr. O'Quin, did you swear to the return as\ made by the estate of W. P. Hayne, before J. W. Oglethorpe, clerk of the court and ex officio notary public? (Objection overruled.) A. It is signed; the affidavit appears to be signed, 'Nettles & O'Quin,' and I recall at the time that I swore to it before J. W. Oglethorpe, and he called my attention to it, and you will notice that he wrote my name up there on the affidavit. I personally swore to that return before J. W. Oglethorpe."

But the law requires the assessor, or his deputy, to actually administer the oath or affirmation orally "to the person signing the same," and makes no provision for the taking of the oath before any other officer than the assessor or for the penalizing of any other officer for misfeasance or nonfeasance in that connection, or for the administering of the oath to a person who does not, or a firm which cannot, take it, and sign his, or its, name as evidence of having done so. Finally Mr. O'Quin testifies that he was not at all familiar with the property of "Mr. Hayne, the plaintiff," or its value; that he knew in January 1916, that it was producing oil in 1915, but that he returned only its agricultural value, and the petition alleges "that the valuation of property in the parish of Red River never exceeds 25 per cent. of the actual valuation for any purposes whatever," his testimony upon that point reading (in part) as follows:

"Q. But, you only gave in, as the assessment, its agricultural value? A. That was the assessment. Q. You knew that would not be accepted? A. I was not a clairvoyant. * * * Q. You did not think it would be? A. I was going to do my very best to make them accept it; that is what I am trying now. Q. That was your first stall, as a preliminary to the suit that you have now brought? A. Well, the law has made that a prerequisite."

[5] The law, as we understand it, has made it a prerequisite to the bringing of a suit of this character that a return shall be made to the assessor prior to April 1st of each year by the owner of the property to be assessed, or some one capable of taking an oath, and shown upon the face of the return to be authorized to represent the owner, or to have the property in his possession or under his control or to have an interest in paying, or to be under some obligation to pay the tax or to be the representative of such person, which return must be verified by the oath of the person making it, administered by the assessor, or his deputy, and signed by the affiant in the presence of one or the other of those officers; and the person making such return must at least believe that the statements therein contained and sworn to are true. And as the return herein relied on by plaintiffs was lacking in several of those essentials, we hold that it was insufficient in law, and that plaintiffs are therefore estopped to contest the return of the assessor, which they here attack.

[8] Act 170 of 1898, § 56, p. 373, declares:

"That the attorney at law who represents the tax collector * * * in all proceedings for the reduction of assessments and collection of taxes (license taxes excepted), * * * shall receive a compensation of ten per cent. on the amount collected, calculating same upon the aggregate amounts of taxes and penalties so collected as the result of aforesaid proceedings. The aforesaid commission to the attorney at law shall be paid by the party against whom the judgment is rendered in whole or in part, and shall be collected by the tax collector as costs, at the same time that the taxes and other penalties are collected."

It is said that the allowance by the court a qua of the fee thus provided for was "manifest error," for the reasons, as alleged, that the district attorney, together with a special attorney employed by the police jury, represented the defendants in this case; whereas the law implies that the compensation is to be allowed only to the attorney appointed by the Governor to assist the tax collector; that

no attorney representing the tax collector appeared in the case; and that the district attorney, who represented the defendants herein, is only allowed such fees and penalties as are prescribed by law. The implication from the statute quoted, as we understand it, is that the compensation is to be allowed for the benefit of any attorney at law who successfully represents the interests of the state in any proceeding for the collection of a tax or the cancellation or reduction of an assessment which obstructs and delays such collection. In this case the pleadings filed on behalf of defendants bear the signatures of J. F. Stephens and S. R. Thomas, as attorneys, and they both participated in the trial in the district court, and have both signed the brief for defendants in this court. Mr. Stephens, it is true, appears as district attorney, but article 125 of the Constitution, which declares that the district attorney shall receive a salary of $1,000 a year, further declares that "he shall also receive fees," provided that no fee shall be allowed in a criminal case, except on conviction, and then not to exceed $5. It therefore provides the exception to the rule, as contemplated by article 180, in declaring that no officer whose salary is fixed by the Constitution shall be allowed any fees or perquisites of office, "except where otherwise provided for by this Constitution."

Act 125 of 1912 was intended, as it appears to us, to prevent police juries and other state agencies from incurring obligations to district attorneys for services which those officers are required to render without other compensation from their official clients than their salaries; but, as the Constitution declares that they "shall also receive fees," and, as Act 170 of 1898 declares, in effect, that a fee shall be taxed as costs for the benefit of the attorney at law who successfully represents the state in a suit which delays the collection of a tax, we are of opinion that the fee thus accruing to the attorney at law, whether he be the district attorney or another, is not within the meaning of that statute.

[6] The case, as presented, concerning the road tax, may be stated as follows:

On June 17, 1917, elections were held to take the sense of the qualified voters upon the question of voting a 5-mill tax, for five years, in aid of the building of roads throughout the parish, and upon the same day, a similar election was held in road district No. 2, composed of wards 4, 5, and 6, to take the sense of the voters in that territory upon the question of voting a similar tax, for a like period, for the building of roads and bridges therein.

Plaintiffs object to the tax as levied in road district No. 2, on the ground that it, and the parish tax, levied on the same day, taken together, exceed, by 5 mills, a constitutional limitation; and that the road district tax must therefore be decreed null. Neither the power of the police jury to create a road district of the entire parish, and subroad district of different wards, nor the regularity in the proceeding whereby that was done, and the election ordered, held, and returned, is called in question, the contention being that the two taxes together amount to 10 mills, and that 5 mills was the maximum limit then allowed by article 291 of the Constitution of 1898. Counsel for plaintiff seem to think that authority for the 10-mill levy might be found in the Constitution of 1913, but they allege that:

"The attempt on the part of the constitutional convention of 1913 to alter and amend the provisions of the article 291 of the Constitution of 1898 and extend the powers of parochial and municipal corporations was ultra vires and beyond the authority granted that convention by Act 1 of 1913, and the said extension void."

It is admitted that plaintiffs, including the Natalie Oil Company, paid the tax in dispute for the years 1913, 1914, and 1915, without protest of any kind, and defendants set up

that acquiescence as a ground for an equitable estoppel.

Article 291 of the Constitution of 1898 as originally adopted authorized police juries to form their parishes into road districts, and, in order to raise funds for road and bridge purposes, to set aside at least 1 mill per annum of the taxes levied by them, to impose a per capita tax, and to levy a license tax on vehicles.

The second paragraph of the article reads:

"To carry into effect the provisions of this article the police juries may enact such ordinances of a civil nature as may be necessary to enforce the property license tax, and, of a criminal nature, to enforce the per capita tax. Other taxes may be levied by the police juries for road and bridge purposes, not to exceed five mills for five years on the property of the parish, or any ward thereof, where the rate of taxation and the purpose of the tax shall have been submitted to the property taxpayers of said ward or parish * * * and a majority in number and value of those voting shall have voted in favor thereof."

By an amendment to the Constitution, though not particularly directed to article 291, adopted in 1910 (Act 14 of 1910), a special state tax of one-fourth of a mill was levied for the creation of a road fund, the same to be considered part of the 6-mill state tax already authorized.

At the general election of November 5, 1912, article 291 was amended, pursuant to Act 236 of 1912, by dividing paragraph No. 2, as in the Constitution, into two paragraphs, and adding a sentence, as the second in order, to the paragraph 3, thus created so that in the amendment paragraphs 2 and 3 read:

"(2) To carry into effect the provisions of this article the police juries may enact such ordinances of a civil nature as may be necessary to enforce the property and license tax, and of a criminal nature, to enforce the per capita tax.

"(3) Police juries and municipal corporations * * * may levy other taxes for the construction and maintenance of public roads and bridges within the territorial limits of said parishes, and may incur debt, and issue bonds therefor, in the manner and to the extent authorized under provisions of articles 232 and 281 of the Constitution and the statutes adopted to carry them into effect. Other taxes may be levied by the police juries for road and bridge purposes not to exceed five mills for five years on the property of the parish, or any ward thereof, whether [whenever] the rate of taxation and the purpose thereof shall have been submitted to the property taxpayers of the said ward, or parish, entitled to vote * * *, and a majority of those voting at said election shall have voted in favor thereof. That this article shall be self-operative."

The act of 1913 (No. 1, Extra Sess.) ordered an election to take the sense of the electors upon the question of holding a constitutional convention in accordance with the proposition therein contained; that is to say, to quote the language, "for the following purposes and upon the following terms and conditions, to wit," and among the conditions imposed was a prohibition against the adoption of any constitutional provision inconsistent with those of the then existing Constitution, except such as might relate to the bonded debt of the state, of $11,108,300 and to the sewerage and water board of New Orleans, and a withholding, in specific terms, of the power to change the then existing laws relating to, or in any manner affecting, parochial or municipal corporations.

It has been held by this court that the proposal contained in the act in question, having been submitted to and adopted by the people of the state in accordance with its terms, operated as a mandate to the convention whereby its power was regulated and determined (State v. Am. Sugar Ref. Co., 137 La. 407, 68 South. 742; Foley v. Dem. Par. Committee, 138 La. 220, 70 South. 104), so that, if there have been incorporated in the Constitution of 1913 any provisions which are inconsistent with those of article 291 of the Constitution of 1898, they are of no effect. Mr. W. O. Hart, who was a prominent member of the convention of 1913, in a brochure entitled "Comparison of the Constitutions of 1898 and 1913," etc., makes the following statement as to the action taken by

the convention in regard to that article, to wit:

"Articles 291 and 292 consolidated as article 292 in the Constitution of 1913. Article 291 amended to conform to constitutional amendment adopted November 5, 1912 (Act No. 236 of 1912), and the second sentence of the third paragraph [as in the amendment] omitted because conflicting with the first sentence thereof."

But, though the limitation of the taxing power, as conferred by the second sentence, thus omitted, were in conflict, in all respects, with the grant which, by the reference to articles 232 and 281, is contained in the first sentence, the fact remains that to so decide, and to omit (or strike out) the second sentence, would be to make an important change in, and adopt a provision inconsistent with those of, the then existing Constitution, and affecting parochial and municipal corporations, by abrogating the restrictions, imposed by the omitted section, upon their powers of taxation, which action was not within the specifically delegated authority of the convention by which it was taken, but, to the contrary, was specifically excluded therefrom. The two sentences do not, however, in all respects, if at all, conflict with each other. The first contains a general grant of power to levy special taxes for the construction and maintenance of roads and bridges, and then, following a comma, the sentence proceeds:

"And may incur debt and issue bonds therefor, in the manner and to extend [sic] authorized under provisions of articles 232 and 281 of the Constitution and the statutes adopted to carry them into effect."

The reference to the two articles is therefore directed to the manner and extent in and to which debt may be contracted and bonds issued, and not to the rate of taxation. Turning to article 281 (since article 232 has little or no bearing upon the question at issue), we find that, as amended and re-enacted in accordance with Act 197 of 1910, it confers upon municipal corporations (city of New Orleans excepted), parishes, school, drainage, subdrainage, road, navigation, or sewerage districts, when authorized by a majority in number and amount of the property tax payers, and for the purposes of a variety of specified works of public improvement (including roads and bridges), the title to which must vest in the public, the power to incur debt, levy special taxes, not to exceed 10 mills on the dollar, issue negotiable bonds, to mature in not more than 40 years, bear interest at not more than 5 per cent., be sold at not less than par, and not to exceed, in the aggregate and for all purposes, 10 per cent. of the assessed value of the property of the subdivision issuing them. Article 291 is found, in the Constitution of 1898, under the title "Public Roads," and deals with no other subject than the power of police juries to incur debt, levy taxes, and issue bonds for the construction and maintenance of roads and bridges. As originally adopted the article authorized police juries, with the consent of the property tax payers, to levy special taxes, not to exceed 5 mills for 5 years, for road and bridge purposes, but conferred no authority to incur debt or issue bonds, and the evident purpose of its amendment and readoption, pursuant to Act 236 of 1912, was to supply that omission. Finding, apparently, that the restrictions imposed upon the exercise of such authority by articles 232 and 281 were sufficient for the cases specified in those articles, the General Assembly, in proposing, and the people of the state, in adopting, the amendment to the article 291, included those restrictions merely by reference to the articles in which they were contained, as appears from the first sentence of paragraph 3 of the amended article. But the General Assembly did not propose, nor did the people adopt, any change in the rate of special taxation for road and bridge purposes. To the contrary, the question of incurring debt and issuing bonds having been disposed of, as above stated, in one sentence, the following sentence

was devoted to the question of the rate of taxation, to be allowed for the construction and maintenance of roads and bridges, as contradistinguished from that allowed by article 281 for those purposes and also for such purposes as the "purchasing or constructing of systems of waterworks, sewerage, drainage, navigation, lights, public parks and buildings, with all necessary equipments and furnishing," and the conclusion reached was that, while a 10-mill tax, running 40 years, or more, might be needed for other improvements, such as those mentioned, a 5-mill tax for 5 years was all that was required for road and bridge purposes; and so the second sentence of the third paragraph of article 291, as amended, reads (in part):

"Other taxes may be levied by the police juries, for road and bridge purposes, not to exceed five mills for five years on the property of the parish, or any ward thereof. * * * That this article shall be self operative."

We conclude, then, that the 10-mill rate of taxation, established for road and bridge purposes by article 281, as amended pursuant to Act 197 of 1910, was superseded by the 5-mill rate, re-established by article 291, as amended pursuant to Act 236 of 1912. We therefore concur with the judge a quo in the opinion that the road tax in question is unconstitutional, and that plaintiffs cannot be compelled to continue its payment.

[7] It is said that the plea of estoppel, based on the payments heretofore made by plaintiffs and the fact that such acquiescence has led the police jury to incur obligations which it may find difficulty in discharging, should be sustained, and we think it entitled to consideration, but we do not see our way to its maintenance. "An acknowledgment," it has been said by this court, "can never be invoked to maintain a condition or state of things created in violation of a prohibitory law." Insurance Co. v. Harbor Protection Co., 37 La. Ann. 236; Succession of Jacobs,

104 La. 458, 29 South. 241. We are confronted also with Act 219 of 1914, p. 416, which declares:

"That the plea of estoppel shall never be allowed by the courts of this state in matters of local or municipal assessments where there are radical defects in the proceedings leading up to such local assessments," etc.

To which we add that plaintiffs' counsel have filed in this court a plea of res judicata, which, whether good or bad, is accompanied by certified records, showing that at the suit of several taxpayers, and rather large ones, as we imagine, this particular tax was declared null, more than a year ago, by a judgment from which no appeal appears to have been taken, so that, if the tax should now be sustained, we should bring about the undesirable situation of compelling some members of a community to pay a tax, whilst others, similarly situated, have obtained exemption. We find no error in the judgment appealed from, and it is

Affirmed.