## ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant,

### v.

## The CITY OF ST. LOUIS, a Municipal Corporation, John H. Poelker, Comptroller of the City of St. Louis, and Joseph Hayden, License Collector of the City of St. Louis, Respondents.

No. 45785.

Supreme Court of Missouri,
En Banc.

June 10, 1957.

Dissenting Opinion June 18, 1957.

Gaylord C. Burke, St. Louis, H. M. Stolar, Norman Begeman, St. Louis, for appellant.

James V. Frank, City Counselor, Forrest G. Ferris, Jr., Associate City Counselor, John J. Shanahan, Associate City Counselor, St. Louis, for respondents.

Benj. M. Powers, City Counselor, Frank O. Knight, Asst. City Counselor, Kansas City, amicis curiae, for Kansas city.

John H. Hendren (of Hendren & Andrae), Jefferson City, William S. Hogsett, Powell C. Groner (of Hogsett, Houts, James, Randall & Hogsett), Kansas City, amicis curiae.

HOLMAN, Commissioner.

This proceeding for a declaratory judgment was instituted by plaintiff St. Louis Public Service Company against the City of St. Louis, Milton Carpenter, Comptroller of said city, and Joseph Hayden, License Collector thereof, to determine the validity of Section 12, Chapter 14, Revised Code of the City of St. Louis, Missouri, 1948, which imposes an annual operating tax in a sum equal to 5% of the gross receipts derived from transportation of passengers in the operation of motorbuses in said city. Defendant city has called to our attention the resignation of Milton Carpenter as Comptroller, on January 14, 1957, and the appointment of John H. Poelker to that office, effective the same date. The city has requested that we substitute Mr. Poelker as a defendant in the place of Mr. Carpenter, and that substitution is accordingly made.

More specifically, plaintiff in this action, sought an adjudication that (1) said Section 12 be declared invalid and void; (2) defendants be perpetually enjoined from enforcing the provisions of said section; and (3) the court determine that the amount of $782,964.32 paid by plaintiff to defendant city, under protest, on April 1, 1955, and the amount of $700,000 paid in the same manner on May 22, 1956, was illegally collected and should be refunded by defendants to plaintiff. Defendants, in their answer, denied the invalidity of Section 12; assert-

ed that plaintiff was estopped to question the validity thereof and sought a judgment against plaintiff for the sum of $31,433.50, the remaining balance of said tax due for the fiscal year ending January 31, 1956. The trial court found for defendants upon all of the issues and entered a judgment and decree to the effect that said Section 12 was valid, and further entered a judgment in favor of defendant city and against plaintiff in the sum of $31,433.50, as prayed. Plaintiff has duly appealed.

There is no dispute about the facts with which we are concerned. They appear in an agreed statement of facts and in certain exhibits incorporated therein by reference. A gross receipts operating tax of 3% from motorbus operations was imposed in an ordinance adopted in 1920. This tax was increased to 5% by an ordinance approved January 24, 1940, which is now Section 12 of Chapter 14 of the 1948 City Code, and which reads as follows: "All persons engaged in the operation of motor busses shall pay annually to the license collector, as an operating tax, in addition to the license tax, a sum equal to five per cent of the gross receipts derived from transportation by means of such motor busses in the city. Such operating tax shall be computed for the fiscal year ending January thirty-first, and shall be paid to the license collector on or before the first day of April, following the fiscal year for which such license is due."

The principal contention of plaintiff is that Section 12 is invalid because the City of St. Louis has no inherent power to levy a gross receipts operating tax and said section is in conflict with Section 301.340 RSMo 1949, V.A.M.S., which is alleged to be the only express grant authorizing municipal occupation taxes on motorbus operations. That section was amended in 1955 in a manner that would not seem to affect the issue before us. That statute contains three subsections. The first subsection provides that municipalities, by ordinance, may levy and collect license taxes from the owners of motor vehicles in amounts not exceeding those therein provided. Subsection 2 provides, in part, that "when the owner of any motor vehicle * * * shall have complied with the requirements of this law he shall not be required to pay any license tax or fee to any municipality, or to submit to any other requirement, except as authorized by this law, in any municipality of this state." The third subsection is as follows: "Municipalities may impose occupation taxes on the business of transporting passengers, freight and merchandise for hire carried on within their limits, and may measure such taxes by the number of motor vehicles engaged in such transportation." Plaintiff argues that the word *may* in said subdivision, in referring to the manner of measuring occupation taxes, must be construed as *shall*, Kroger Grocery & Baking Co. v. City of St. Louis, 341 Mo. 62, 106 S.W.2d 435, 111 A.L.R. 589; Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 87 S.W.2d 195, and hence the only occupation tax authorized by that section is one measured by the number of motor vehicles engaged in such transportation, and therefore Section 12 which measures the tax by a percentage of the gross receipts is inconsistent therewith and void.

The defendant City of St. Louis contends (1) that the tax is authorized as a revenue measure levied under the taxing power, whereas, Section 301.340, supra, is a regulatory measure under the police power; (2) that the state motor vehicle laws have no application to the motorbus operations of the plaintiff, as such are operated as an integral part of plaintiff's local street railway system; and (3) that plaintiff is estopped to attack the validity of Section 12.

We have concluded that plaintiff, by its acts and conduct over a period of many years, has placed itself in a position where it is estopped from attacking the validity of Section 12. Since this is the only point we will determine, our further statement of facts will be limited largely to those which bear upon that issue.

While we do not base our decision herein upon the doctrine of laches, we think it worthy of note that the provisions of Section 301.340, supra, with which we are here concerned, have remained substantially the same since 1921. Laws 1921, 1st Extra Sess., Section 24, p. 99. As stated, the original gross receipts operating tax was imposed in 1920. It would therefore appear that the validity of this tax could have been challenged very shortly after the enactment of the taxing ordinance.

Motorbus transportation is authorized and regulated in the City of St. Louis, Missouri, by the provisions of Chapter 14 of the City Code of 1948 which was originally enacted, in substantially its present form, on July 12, 1920. We refer to certain provisions of that chapter which appear relevant to the issue before us. Section 3 provides that no motorbus shall engage in carrying passengers for hire until a license for such motorbus has been obtained, and that no license shall be issued until a permit has been obtained from the Board of Public Service permitting the operation of such bus. Section 4 states that application for such permits shall be made to the Board of Public Service on forms to be furnished by the board and shall be considered at a public hearing after publication of notice thereof. Section 5 deals with the qualifications of applicants and makes the further provision that before granting a permit the board shall require the applicant to give bond to the city in the sum of $3,000 for each vehicle to be operated, with a proviso that if one person proposes to operate more than five buses the total bond required shall be in the amount of $10,000. It is provided that "such bond * * * shall provide adequate security for the prompt payment of any sum accruing to the city and for the performance of other obligations, as well as adequate security for the payment of any damages occurring, or judgments obtained by any person on account of the operation of such motorbus."

Section 7 of the chapter under consideration states that an applicant shall not be granted a permit to operate buses along a route already served by another person unless the board shall find that additional buses should be used thereon. "After so finding, the board shall give the person holding the permit to operate along such route or in such district the right to operate additional buses in such number as the board shall have found necessary; and only upon the refusal or failure to operate such additional buses within the time fixed by the board, by the person holding the permit, shall the application be granted." It is provided in Section 8 that the application for a license shall contain certain information and statements, including the following: "That a permit has been obtained from the Board of Public Service, as required by this article, and that the bond required by the city has been approved and filed." Section 11 provides for the payment of an annual license tax in the sum of either $25 or $50 for each bus, depending upon the seating capacity. Section 12 provides for the gross receipts tax with which we are here concerned. Section 13 requires the filing of an annual sworn statement, on or before March 1, showing the amount of the gross receipts for the fiscal year ending January 31, which statement shall be investigated by the comptroller and certified by him to the license collector. Section 15 contains the procedure for the transfer of a license upon the sale or transfer of a motorbus.

It is agreed that since about 1930 all of the motorbuses operated by plaintiff within the City of St. Louis have been operated under permits issued by the Board of Public Service, which said permits were either applied for by plaintiff or lawfully acquired by it from others. Many of plaintiff's early permits (apparently issued between 1924 and 1941) had been issued to the Peoples Motorbus Company of St. Louis. The agreed statement discloses that, "For each of these permits the acceptance thereof by plaintiff reads: 'Compliance in full with all provisions of Section 1874 to Section 1882 inclusive, and Section 1885 to Section 1895, inclusive, and Ordinance 41,724.'"

Ordinance 41,724 is the enactment which increased the gross receipts tax from 3 percent to 5 percent and it became effective January 24, 1940.

It has been a rather common practice in recent years for defendant city to issue bus permits to plaintiff for a specified period, although these permits are regularly extended or continued from time to time, as long as plaintiff has any need therefor. On May 14, 1940, upon the termination of a receivership to which plaintiff was subject, plaintiff filed with defendant city's Board of Public Service, its written acceptance of all bus permits theretofore granted to it and to the Peoples Motorbus Company of St. Louis. Prior to 1955 plaintiff paid all gross receipts taxes levied pursuant to what is now Section 12, apparently without protest.

On June 19, 1930, plaintiff gave the bond required by the ordinance (now Section 5, Chapter 14) with plaintiff as principal and United States Fidelity and Guaranty Company as surety. That bond was replaced on June 19, 1947, by a bond, identical in terms, with Transit Casualty Company as surety, which latter bond was in full force and effect at trial time. Said bond provides, in part, as follows: "Whereas, the St. Louis Public Service Company has been granted permission by the Board of Public Service of the City of St. Louis, Missouri, by various permits to operate motorbuses in accordance with the terms of said permits, and the provision of the ordinances of the City of St. Louis. Now, therefore, if the said St. Louis Public Service Company, its successors and assigns, shall duly observe all such ordinances of the City of St. Louis * * * respecting the liability of the principal hereunder, and all regulations which may be adopted by the Board of Public Service of said City or are in force, and shall well and truly pay to the City of St. Louis all moneys to which it may become entitled by reason of the operation of said motor busses * * *."

■ The rule is well settled that one voluntarily proceeding under a statute or ordinance, and claiming benefits thereby conferred, will not be heard to question its validity in order to avoid its burdens. The same or similar rules have been applied in litigation involving many different types of instruments, licenses, or other transactions. The designation used in referring to this rule or doctrine is obviously unimportant. It is frequently called an estoppel. However, it is akin to the rule against assuming inconsistent positions and it involves the principles of waiver, election, and ratification rather, perhaps, than being limited to the precise principles of equitable estoppel. Regardless of the name or principle designated, the result is clearly the same. It precludes one who accepts the benefits from questioning the validity of the accompanying obligation. For convenience, we will hereinafter refer to this rule or doctrine as an estoppel.

As indicated, we find that this doctrine has been applied in many different situations. We will briefly refer to a number of cases which tend to support our decision herein. This court, in Kansas City v. Kansas City Belt Railway Co., 187 Mo. 146, 86 S.W. 190, held that a railroad company, after having sought and accepted a franchise upon condition that it maintain a portion of the street in a certain manner, was thereafter estopped from contending that the terms specified were unreasonable. We have also held that a probate judge who accepted his office under an existing statute requiring that certain excess fees collected by him should be paid into the public treasury, was thereafter estopped to dispute the validity of that part of the law which required him to so pay said excess fees. State ex rel. Buchanan County v. Imel, 242 Mo. 293, 146 S.W. 783. In Greene County v. Lydy, 263 Mo. 77, 172 S.W. 376, it is said that a probate judge who qualified for his office by giving the statutory bond, and thereafter collected the fees of the office, was estopped, in a suit on the bond to collect excess fees, from asserting the unconstitutionality of the law under which he gave the bond. Another instance of the

application of this rule appears in State v. Bennett, 315 Mo. 1267, 288 S.W. 50, wherein it was held that a defendant having accepted a hunter's license and exercised the privilege thereof, could not complain of the alleged unconstitutionality of another provision of the statute which required him to submit to the inspection and count of game in his possession by the game warden. Also, in DeMay v. Liberty Foundry Co., 327 Mo. 495, 37 S.W.2d 640, we held that an employee who elected to accept the provisions of the Workmen's Compensation Act, Section 287.010 et seq. RSMo 1949, V.A.M.S., is precluded by such act and conduct from thereafter claiming that the Act was unconstitutional.

The Supreme Court of the United States has frequently applied the doctrine of estoppel in situations we consider analogous to the one before us. In St. Louis Malleable Casting Co. v. George C. Prendergast Construction Co., 260 U.S. 469, 43 S.Ct. 178, 67 L.Ed. 351, the court held that a property owner who had connected his property with a sewer was thereafter estopped to attack the tax bill issued against his property for the construction of the sewer on the ground that it violated a provision of the constitution. In Grand Rapids & I. R. Co. v. Osborn, 193 U.S. 17, 24 S.Ct. 310, 314, 48 L.Ed. 598, the court held that a railroad company "Having voluntarily accepted the privileges and benefits of the incorporation law of Michigan the company was bound by the provisions of existing laws regulating rates of fares upon railroads, and it is estopped from repudiating the burdens attached by the statute to the privilege of becoming an incorporated body." In United Fuel Gas Co. v. Railroad Commission of Kentucky, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390, it was held that the gas company, after failing to obtain approval of a rate increase in proceedings before the Railroad Commission, could not thereafter challenge the constitutionality of the statute creating the Commission in a suit in the Federal courts. See also, Hurley v. Commission of Fisheries, 257 U.S. 223, 42 S.Ct. 83, 66 L.Ed. 206, and Pierce Oil Corp. v. Phoenix Refining Co., 259 U.S. 125, 42 S.Ct. 440, 66 L.Ed. 855.

In a suit to foreclose a mortgage given to secure a loan made by the Federal Farm Board, it was held that a defendant was not in a position to question the constitutionality of the Act since he had proceeded to obtain a loan under the Act. North Dakota-Montana Wheat Growers Ass'n v. United States, 8 Cir., 66 F.2d 573, 92 A.L.R. 1484. In Tovrea Packing Co. v. Livestock Sanitary Board, 44 Ariz. 151, 34 P.2d 420, 422, a plaintiff who possessed a license to engage in the business of slaughtering livestock sought to attack the constitutionality of certain provisions of the statute relating to inspection fees. It was held that it was estopped from so doing, the court stating the rule as follows: "It is the general rule of law that, when parties have sought or derived benefit by exercising a privilege bestowed upon them by law, they will be estopped from denying the validity of terms fixed as a condition for the exercise of such privilege." Of similar import is the case of Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107, wherein a party who made application to the Railroad Commission for a permit to drill an oil well under a certain rule of the Commission was thereafter precluded, in a suit filed by the refining Company to set aside the order granting that permit, from attacking the validity of the rule under which he had received the permit.

In Cofman v. Ousterhous, 40 N.D. 390, 168 N.W. 826, 18 A.L.R. 219, it was held that a person who obtains a license under the law to operate a cream station, and who for a time enjoys the benefits thereof, cannot afterwards when the license is sought to be revoked, question the constitutionality of the Act under which he obtained the license. It appears that in the case of Stein-Hall Mfg. Co. v. H. M. Glossbrenner & Co., 84 Ind.App. 306, 145 N.E. 526, 527, where plaintiff accepted a license of the Food Administration during the war

with Germany, it was held that plaintiff could not thereafter challenge the rules and regulations of said Administration, the court saying, "Appellant was under no compulsion to make its application for a license and to accept the same from the department of Food Administration. It could accept such license or not as it chose. It is true that, if it had refused to so accept, it would have been precluded from engaging in the business of handling rice products. It chose to accept the license, and to engage in the business under the rules and regulations of the Food Administration. It agreed in its application to obey the rules and regulations, included in which was the requirement to use the form of contract prescribed. Such application being its voluntary act, it is not now in position to challenge the legal force of such rules and regulations. Having had the benefit of the license which was granted to it, it should accept the burden which it imposed." For other similar cases, see People ex rel. Jackson v. Suburban R. Co., 178 Ill. 594, 53 N.E. 349, 49 L.R.A. 650; United States v. Smith, D.C., 285 F. 751; Maxwell v. Thompson, 195 App.Div. 616, 186 N.Y.S. 208.

In the instant case, for more than 25 years, plaintiff has aplied for and received the issuance and transfer of valuable permits from the Board of Public Service of defendant City of St. Louis under which it has operated all of its bus routes. These permits were obtained under the provisions of an ordinance (Chapter 14) which provided in detail for the authorization and regulation of bus operations. One section of that ordinance imposed the gross receipts tax now being attacked. While the type of permit received by plaintiff might not amount to a franchise (in the sense that that term is generally understood in designating grants to utility concerns) it did confer a valuable special privilege which, for all practical purposes, was equivalent to a franchise. It was stipulated that under the established practice the permits issued to plaintiff were regularly extended or continued as long as plaintiff had any use for

same. Moreover, these permits, in practical effect, amounted to monopolies, as the ordinance provided that no additional permit could be granted along the same route until after a person holding an existing permit was afforded the opportunity and refused to operate additional needed buses.

Plaintiff repeatedly applied for and received these permits with full knowledge that it would be required to pay the gross receipts tax specified in another section of the ordinance. After having received the benefits afforded by these permits it now seeks to avoid the burden of the resulting tax obligation. This, the law will not permit plaintiff to do. It would appear that plaintiff will not be heard to challenge this tax while operating under the permits obtained in the manner detailed herein.

It should be noted that this is a much stronger case for application of the doctrine of estoppel than the usual "acceptance of benefits" case. While we need not (and do not) decide the question, it would seem that plaintiff actually contracted to pay the tax in question. This appears in two respects. First, it will be remembered that as a condition for the issuance of these permits plaintiff gave a bond which, among other obligations (and while inadequate in amount), specifically bound plaintiff to comply with the applicable ordinances and to "pay to the city of St. Louis all moneys to which it may become entitled by reason of the operation of said motor buses." Secondly, we have already pointed out that plaintiff's acceptance of a large number of the permits consisted of a recital indicating that it would fully comply with certain ordinances, among them being the one (Section 12) now in question. While, as stated, we do not actually decide that these acts technically constitute a legally enforceable contract to pay all of the gross receipts taxes that might accrue, we are firmly of the view that these acts, when considered in connection with the other facts heretofore mentioned, make this an exceedingly strong case for the application of the doctrine of estoppel.

Plaintiff, in support of its contention that it is not estopped to question the validity of this tax, has cited Bowers v. New York Trust Co., 2 Cir., 9 F.2d 548, Hayne v. Assessor, 143 La. 697, 79 So. 280, and Carpenter v. Town of Central Covington, 119 Ky. 785, 81 S.W. 919. These cases contain statements to the general effect that the payment of a tax for one year will not bar the right to contest the tax for another year. It is obvious that these cases are not in point. We have made it clear that our decision is not based upon the fact that plaintiff paid the questioned tax for many years before asserting this challenge to its validity. No purpose would be served by repeating the reasons we have already stated for applying the doctrine of estoppel herein.

■ We are in full accord with the result reached in the trial court which denied plaintiff all relief and granted defendant city a judgment for the unpaid balance of the tax in question. However, since the trial court also made a finding and entered a declaratory judgment to the effect that Section 12 of Chapter 14 "is valid, legal and binding," we cannot fully affirm the judgment as entered. As indicated, we have not ruled that question but consider it sufficient to rule that plaintiff is estopped to question the validity of Section 12.

The judgment is reversed in part and cause remanded with directions to modify the judgment in accordance with the views expressed herein.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court en banc.

HOLLINGSWORTH, WESTHUES, STORCKMAN and LEEDY, JJ., concur.

DALTON, C. J., concurs in result.

HYDE and EAGER, JJ., dissent.

HYDE, Judge.

I respectfully dissent from the opinion adopted herein by the Court en Banc because I believe, as the trial court found, that a justiciable controversy existed between plaintiff and defendants, and that plaintiff was entitled to have it settled by a declaratory judgment regardless of whether it would be for plaintiff or against it. See cases cited in Evans v. Brussel, Mo.Sup., 300 S.W.2d 442, 444. Determination of the validity of an ordinance is specifically stated by Sec. 527.020 (statutory references are to RSMo, V.A.M.S. except where otherwise designated) to be one of the grounds upon which a party may obtain a declaration of rights and I do not think the estoppel theory is a sound basis for holding that plaintiff can never have this issue determined. Furthermore, I think the trial court correctly held the ordinance in question to be valid.

The cases upon which plaintiff relies for claiming the ordinance invalid are Kroger Grocery & Baking Co. v. City of St. Louis, 341 Mo. 62, 106 S.W.2d 435, 111 A.L.R. 589, and Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 87 S.W.2d 195, 205. Both of these cases involved the same statute, the Act of 1879, authorizing a merchants' tax, graduated in proportion to the sales made, in cities of over 300,000 inhabitants. (Laws 1879, p. 141, now 92.-040.) The J. I. Case case, adopted in Banc, was followed in the Kroger case. In J. I. Case, we did not hold that the word "may" in a statute must always be construed to mean "shall" or "must". Instead we said: "The primary rule of construction of statutes or ordinances is to ascertain and give effect to the lawmakers' intent." We discussed certain auxiliary rules, helpful for this purpose, quoting from 2 Lewis-Sutherland Statutory Construction, 2d Ed., 919, Sec. 492, as follows: "Where authority is given to do a particular thing, and the mode

of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded. Such affirmative legislation, and any other which introduces a new rule, implies a negative." We then stated: "We, therefore, must decide (with the aid of these rules) the original question of whether the Legislature intended that cities of 300,000 should follow the sales method of levying occupation taxes upon merchants and manufacturers." In deciding that question, we considered the fact that this statute was an enabling act to put into effect new tax provisions of the 1875 Constitution and provided a comprehensive plan for cities over 300,000, "authorizing both a property tax on merchandise, raw material, and machinery of merchants and manufacturers, and a tax on their occupations upon the basis of the sales they made." Our conclusion was "that the Legislature intended that the method stated in this act for taxing such occupations should be used by such cities if they taxed such occupations."

The situation in this case is very different. The statutory provision upon which plaintiff relies (now 301.340(3) as amended in 1955) was not enacted as a part of a statute authorizing cities to impose an occupation tax; cities generally had broad powers to impose occupation taxes. Instead, it came in as a proviso in Sec. 24 of the Motor Vehicles Act of 1921 (Laws 1921, Extra Session, p. 76) establishing state control of registration, regulation, operation, ownership, sale, use and equipment of motor vehicles, registration of their operators, creating the Office of Commission of Motor Vehicles, and repealing the limited motor vehicle provisions of Chapter 71, R.S.1919. This proviso was in the section which authorized municipalities to establish speed regulations, traffic regulations and to collect license taxes for registration of motor vehicles, and was as follows: "provided, however, that municipalities may impose occupation taxes on the business of transporting passengers, freight and merchandise for hire carried on within their limits, and may measure such taxes by the number of motor vehicles engaged in such transportation; require operators of motor vehicles, engaged in the transportation of persons, freight and merchandise for hire, to submit to reasonable examinations and investigation as to their physical fitness and competency to operate motor vehicles."

The City of St. Louis then had authority to impose occupation taxes (see Art. XX of its Charter) but there was doubt about the effect of Sec. 7596, R.S.1919, providing that motor vehicle license taxes should not exceed one-half of the required state registration fees. It was claimed that municipal occupation taxes measured by the number of motor vehicles used made such an occupation tax a license tax upon such vehicles; and this view was taken by this Court in Ex parte Tarling, Mo.Sup., 241 S.W. 929, involving a transaction evidently occurring before the passage of the 1921 Act. See Ex parte Andrews, 324 Mo. 254, 23 S.W. 2d 95, 96. However, in the Andrews case, we held this was not true under the 1921 Act, and the limitation on license taxes did not apply to occupation taxes, saying: "The occupation tax referred to in the proviso is not a tax on the privilege of driving motor vehicles upon the streets of a city; it is a tax imposed on the privilege of conducting in a city the business of transporting passengers for hire in motor vehicles. It is not, therefore, included within the license tax, which the statute limits to one-third of that collected by the State." (See Laws 1925, p. 288, reducing the maximum city license tax to ⅓.) We approved the opinion of the Springfield Court of Appeals in the same case (Ex parte Andrews, 223 Mo.App. 858, 18 S.W.2d 580, 583) in which the Court stated the meaning and effect of the proviso, in Sec. 24 of the 1921 Act, as follows: "considering the entire paragraph it means, and says that such municipalities may not collect a license tax in excess of one-half of the registration fee

collected by the state, with the understanding, however, if a motor vehicle owner elects to use his vehicle for hire upon the streets of the city, then, in that event, the city may by proper ordinance collect an occupation tax, and that the former provision in the statute does not prohibit municipalities from enacting ordinances providing means for collecting a tax from the users of motor vehicles if such use is the carrying of passengers for hire within the city limits." The Court of Appeals also quoted the definition of occupation tax in Viquesney v. Kansas City, 305 Mo. 488, 496, 266 S.W. 700, 702, stating: "Where a tax is measured by the gross receipts of the business, the amount of premiums received by an insurance company, the number of carriages kept by a livery stable, the number of passengers transported by a street railway company, and other taxes of that nature, it is 'occupation tax'—one form of excise tax." We also said in the Andrews case (23 S.W.2d loc. cit. 96) : "By adding the proviso in said sub-division (c) the Legislature made it plain that it did not intend to include occupation taxes within the limit prescribed for license taxes."

Furthermore, the only reference in the title of the 1921 Act to the matter of municipal authority was "authorizing cities, towns and villages to make certain regulations and to collect license taxes on motor vehicles and trailers." Nothing was said about occupation taxes (since cities already had authority for occupation taxes it was not necessary to do so) nor about any limitations on kinds of occupation taxes. Thus this statute was not an enabling Act granting new authority to cities as was the merchants' occupation tax statute of 1879 construed in the J. I. Case case. Therefore, in view of the nature of this statute, and its legislative history, and considering the claims being made that a City could impose no tax on public transportation motor vehicles except a license tax for use on its streets which could only be one-half of the State registration tax on each vehicle, I think the legislative intent was to make

clear that an occupation tax on public transportation was authorized even though such occupation taxes be measured by the number of motor vehicles used. In other words, to show that a license tax for operating a motor vehicle and a tax on the occupation of transportation, although measured by the number of motor vehicles used, is not one and the same tax; and to state that a limitation on the amount that could be charged for a license tax had no bearing whatever on the imposition of an occupation tax.

Therefore, I do not think the legislative intent, in enacting this proviso, was to make this method of measuring such an occupation tax mandatory or exclusive; and I would affirm the declaratory judgment of the trial court declaring valid the ordinance imposing an occupation tax on the basis of gross receipts.

EAGER, J., concurs.